# MCAIRLAIDS' OPENING STATEMENT
## MARKMAN HEARING
## May 29-30, 2014

*McAirlaids, Inc. v. Kimberly-Clark Corporation, et. al., In the United States District Court for the Western District of Virginia, Case No. 7:13-cv-193*

# INTRODUCTION

# INTRODUCTION

* McAirlaids, Inc. is a manufacturer of bed pads and other absorbent products based in Rocky Mount, Virginia.

* Joined here today by Peter Gawley, President of McAirlaids.



# INTRODUCTION

* McAirlaids is the owner/assignee of U.S. Patent No. 6,675,702 (the "'702 Patent") which is entitled "Method and Device for Producing a Strip of Cellulose Fiber Material for Use in Hygiene Articles."

* It claims a revolutionary method for making an absorbent rollable cellulose fiber web for use in the hygiene sector and resulting products.

# INTRODUCTION

* **Agreed upon term:**
  * "a pair of calender rollers having a pattern of point or line-shaped studs"

* **Disputed terms:**
  * "fiber web"
  * "rollable"
  * "non-separating fusion of the fibers occurs"
  * "tear strength of the fiber web is at least 0.12 kN/m"

# MCAIRLAIDS RELIES ON THE BEST EVIDENCE FOR ITS PROPOSED CONSTRUCTION

| CLAIM TERM | MCAIRLAIDS' PROPOSED CONSTRUCTION | MCAIRLAIDS' AUTHORITIES | K-C'S PROPOSED CONSTRUCTION | K-C'S AUTHORITIES |
|---|---|---|---|---|
| **Fiber web** | Material which results from the claimed manufacturing process | • **Claims and Specification** define fiber web as the material which results from the manufacturing process<br>• **Prosecution History** supports this definition by identifying the fiber web as the material which results from the manufacturing process | Unsupported fibrous layer | • **Figure 1** does not limit the Claims and, contrary to K-C's argument, actually shows the fiber web being supported by a take-up roller<br>• **Prosecution History** does not limit the Claims and merely suggests that the fiber web is strong enough to be capable of being unsupported |
| **Rollable** | Capable of being rolled | • **Claims and Specification** refer to fiber web as capable of being rolled<br>• **Prosecution History** supports this definition by describing the fiber web as "capable of rolling" | May be taken up on a roll | • **Figure 1** does not limit the Claims and merely shows the fiber web being wrapped onto a take-up roller<br>• **Prosecution History** does not limit the Claims and merely suggests that the fiber web is capable of being taken up on a roll |
| **Non-separating fusion of the fibers occurs** | The fibers which have been pressed onto one another can no longer be individually separated, piece-by-piece, from one another with a dissecting needle | • **Claims and Specification** define non-separating fusion as occurring when "the fibers pressed onto one another can no longer be separated from one another when trying to do so with a dissecting needle"<br>• **Prosecution History** supports this definition by stating fusion occurs when these fibers "can no longer be separated with a dissecting needle" | The fibers are permanently and irreversibly joined together and the fibers lose their individual fiber structure | • **Expert Declaration** should not be considered because it is contrary to the intrinsic evidence, is conclusory, and merely restates dictionary definitions<br>• **Prosecution History** does not limit the Claims and merely describes the fiber bonds as "permanent" and "irreversible" to the extent that, unlike the fiber bonds in the prior art, "they can no longer be separated with a dissecting needle" |
| **Tear strength of the fiber web is at least 0.12 kN/m** | Tensile strength of the fiber web is at least 0.12 kN/m | • **Claims and Specification** use the tensile strength measurement of units of force per width "kN/m"<br>• **Prosecution History** supports this definition by repeatedly describing the fiber web as having "tensile strength" of at least "0.12 kN/m" | None. K-C contends there is no possible way to construe this term. | • **K-C Cites No Authorities**<br>• Contrary to K-C's indefiniteness argument, K-C's own Non-Infringement Contentions in this case recognize that this term "**could mean … tensile strength**" and K-C's own evidence in the trade dress case confirms kN/m is a **tensile strength measurement** |

# INTRODUCTION



\* Critical to the '702 Patent is the use of high pressure through two steel patterned calender rollers to fuse some of the individual fibers and form the fiber web.  This fusion occurs without the use of additional glue or binding agents.

# INTRODUCTION

* The Parties have agreed to a definition of the claim term: "a pair of calender rollers having a pattern of point or line-shaped studs."



* Despite agreement on the meaning of the term, the configuration of the rollers used by K-C's Chinese Manufacturer remains a hotly contested fact issue.

# INTRODUCTION

* K-C devotes two pages of its Responsive Markman Brief to arguing that it uses one pattern and one smooth roller.  (Dkt. 91 at 13-14).

* Regardless of what embossing roller configuration K-C uses today, McAirlaids has smoking gun evidence as well as K-C's own admission that K-C previously used two pattern rollers and thus has infringed the '702 Patent.

# TIMELINE OF EVENTS

* **November 19, 2012** – McAirlaids files Trade Dress action against K-C (Case No. 7:12-cv-578) for infringement of dot pattern on bed pad.

* **February 27, 2013** – K-C emails indemnification letter to its Chinese manufacturer, Beijing Beishute,

  **AEO REDACTED**

# Letter from K-C to BB

## AEO REDACTED

.

# K-C MANUFACTURING AGREEMENT

**AEO REDACTED**

# TIMELINE OF EVENTS

## AEO REDACTED

# TIMELINE OF EVENTS

* **April 5, 2013** – In response to Judge Ballou's Order, K-C provides Interrogatory Answer verified by GoodNites' Product Development Lead Angela

## AEO REDACTED

.

# TIMELINE OF EVENTS

* **April 22, 2013** – McAirlaids discloses report of its expert Frank Murray, PhD (a former K-C research scientist and Vice President of Georgia Pacific), opining that, based on his scientific examination of GoodNites and consistent with K-C's Interrogatory Answer, two steel patterned rollers are used to make GoodNites.

* **April 22, 2013** – McAirlaids files Patent Infringement lawsuit.

# TIMELINE OF EVENTS

* **May 7, 2013** – K-C serves a second Interrogatory

# AEO REDACTED

.

# TIMELINE OF EVENTS

# AEO REDACTED

# TIMELINE OF EVENTS

* As of **May 7, 2013**, there had been a fundamental change in K-C's manufacturing process in an effort to design around the '702 Patent.

* As of this date, K-C had:

  > (1) provided an indemnification letter to its manufacturer;

  > (2) received Dr. Murray's expert report; and

  > (3) been sued for patent infringement.

* This change in the process confirms K-C's past use of two pattern rollers and infringement of the '702 Patent.

# GOODNITES **BEFORE** THE CHANGE IN K-C'S MANUFACTURING PROCESS



# GOODNITES **BEFORE** THE CHANGE IN K-C'S MANUFACTURING PROCESS



# GOODNITES **AFTER** THE CHANGE IN K-C'S MANUFACTURING PROCESS



# BEFORE AND AFTER THE CHANGE IN K-C'S MANUFACTURING PROCESS

## GOODNITES BEFORE



## GOODNITES AFTER



# GOODNITES BEFORE AND AFTER THE CHANGE IN K-C'S MANUFACTURING PROCESS

## GOODNITES BEFORE



## GOODNITES AFTER



# GOODNITES BEFORE AND MCAIRLAIDS PRODUCT

McAirlaids' Product
(using two pattern rollers)

Infringing GoodNites





# GoodNites' Fusion Zones
# Top View

Before Embossing Change (Fiber Fusion)

After Embossing Change





# INTRODUCTION

* Whether K-C has ever used two steel patterned rollers to make GoodNites is the real issue in dispute in this case.

* Evidence will show that K-C and its Chinese manufacturer had changed the embossing roller configuration for GoodNites prior to K-C's Second Interrogatory Answer on May 7, 2013.

* By this time, K-C had sent indemnification letter to its manufacturer, received Dr. Murray's expert report, and been sued for patent infringement

* This change is a basis for establishing at least past infringement.

# INTRODUCTION

* K-C sworn interrogatory answer in this case that

  **AEO REDACTED**

* Visual examination of old and new GoodNites confirms the embossing change.

# INTRODUCTION

Old GoodNites
(before embossing change)

New GoodNites
(after embossing change):
size of dot doubled.



# BEFORE AND AFTER THE CHANGE IN K-C'S MANUFACTURING PROCESS

## GOODNITES BEFORE

## GOODNITES AFTER
## (dot is twice the size)





# TECHNOLOGY OVERVIEW

# THE '702 PATENT

* The ingredients in the absorbent core:
  * Primary raw material in McAirlaids' absorbent pads is cellulose fiber called "fluff pulp"
  * Super absorbent material
  * Tissue

# TECHNOLOGY OVERVIEW

* As the fiber moves along the manufacturing line and passes through steel calender rollers, raised portions of the top roller press the fiber against raised portions of the bottom roller at extremely high pressure.

# FIGURE 1 OF THE '702 PATENT



Pre-Compression Rollers

A pair of calender rollers each having a pair of point or line-shaped studs

FIG.1

Direction of Manufacturing Process

# FIGURE 2 OF THE '702 PATENT



**Raw material (fluff pulp)**

**Resulting embossed absorbent core**

**Studs of embossing roller**

FIG. 2

**Direction of Manufacturing Process**

34

# FIGURE 1 OF THE '702 PATENT



FIG.1

Direction of Manufacturing Process

# FIGURE 1 OF THE '702 PATENT



# FIGURE 1 OF THE '702 PATENT



FIG.1

**Direction of Manufacturing Process**

# FIGURE 3 OF THE '702 PATENT



Fiber Web

Fusion zone

Unembossed Region

Embossed region

# THE '702 PATENT

## FIGURE 3

## MCAIRLAIDS' PAD UNDER MICROSCOPE





# INFRINGING GOODNITES



# INFRINGING GOODNITES



Non-woven top sheet

Fusion Zone of Embossed Region

Compressed absorbent core from two patterned rollers

Poly back sheet

# INFRINGING GOODNITES



Outline of embossing studs

Depression Areas (from two pattern rollers)

# APPLICABLE LAW

# APPLICABLE LAW

* Two step patent infringement analysis:
    * First step in a patent infringement case is for the Court to determine the scope and meaning of the asserted claims as a matter of law in what is called a claim construction hearing, or a *Markman* hearing. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), *aff'd,* 517 U.S. 370 (1996).

# APPLICABLE LAW

* The Court places itself in the shoes of a hypothetical "person of ordinary skill in the art at the time of the invention" to understand the ordinary and customary meaning of a claim term. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc).

# APPLICABLE LAW

* Intrinsic evidence, that is the claims, specification, and prosecution history of the patent "is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

* Claims and specification are the best evidence and often dispositive. *Id.* Indeed, "[t]he specification acts as a dictionary when it expressly defines terms used in the claim or when it defines terms by implication." *Id.*

* Specifically, a court determines how one of ordinary skill in the art would understand the claim terms by "examining, **in order**, the claim language itself, the specification, and the prosecution history." *Alza Corp. v. Mylan Labs, Inc.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004).

# APPLICABLE LAW

* No evidentiary burdens apply to questions of claim construction.

* Terms are construed to preserve validity.

* Claims should be construed to preserve their validity and avoid a finding of indefiniteness. *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999).

* Indefiniteness cannot be determined until after claim construction and must be proved by clear and convincing evidence.

# "FIBER WEB"

# "FIBER WEB"

| CLAIM TERM | K-C'S PROPOSED CONSTRUCTION | McAIRLAIDS' PROPOSED CONSTRUCTION |
|---|---|---|
| Fiber web | Unsupported fibrous layer | Material which results from the claimed manufacturing process |

# "FIBER WEB"

* Claims and the specification define fiber web as the material which results from the manufacturing process.

* Prosecution history supports this definition.

# "FIBER WEB": PATENT CLAIMS

| CLAIM | LANGUAGE |
|---|---|
| col. 1, l. 48 to col. 10, l. 5 | "**A method for producing an absorbent fiber web** . . . . where said **fiber web** is suitable for use in the hygiene sector. . . .<br><br>Such that non-separating fusion of the fibers occurs and a **fiber web** with an embossing pattern is created, and (3) the tear strength of the **fiber web** is at least 0.12 kN/m" |
| col. 12, ll. 15-16 | "a **fiber web** with an embossing pattern" |

# "Fiber Web": Specification

| Specification | Language |
|---|---|
| Abstract | "a method for producing a strip of absorbent, rollable cellulose fiber material (100)." |
| col. 1, ll. 7-11, col. 2, ll. 5-7 | "The invention relates to a method of claim 1 ….**for producing a fiber web** consisting of cellulose fibers for use in hygiene products, in particular, personal absorbing hygiene products.  The invention further relates to an absorbent **fiber web manufactured according to this method**….  it is the principal object of the present invention to specify **a method for producing a fiber web** made of cellulose fibers." |
| col. 2, ll. 12-16 | "This object, as well as other objects which will become apparent from the discussion that follows, are accomplished with the method for **manufacturing a fiber web** made of cellulose fibers, which is largely tear resistant, absorbent and rollable, using the following processing steps." |
| col. 2, ll. 32 | "such that a non-separating fusion of the fibers occurs and a **fiber web with an embossing pattern is created**" |

# "FIBER WEB": SPECIFICATION

| SPECIFICATION | LANGUAGE |
|---|---|
| col. 5, ll. 43-47 | [t]hrough point-focused high pressure and crowding of the fibers, loose cellulose or pulp fibers are bonded together in all existing free spaces . . . **resulting in overall very strong fiber web**." |
| col. 9, ll. 34-37 | There has been thus shown and described a novel method ... for **producing a fiber web** consisting of cellulose fibers which fulfills all the objects and advantages sought therefor." |

# "FIBER WEB": FIGURE 1

* "Fiber web" depicted as "100" in Fig. 1, revealing it is the resulting product from the manufacturing process:



# PAGE 11 OF K-C'S OPENING BRIEF



Illustration 1:  Annotated Version of '702 Patent Figure 1 (annotations and highlighting added).

K-C concedes that "before embossing, the fibers are not a fiber web."  (K-C Br. at 10).

# "FIBER WEB": FIGURE 3



FIG. 3

This depicts the product *after* the embossing process is complete.

# "FIBER WEB":  PROSECUTION HISTORY

* Prosecution history supports this definition by defining the fiber web as the material which results from the manufacturing process:

| PAGE | LANGUAGE |
|------|----------|
| MCPAT338 | "A method for **producing an absorbent fiber web**…" |
| MCPAT366 | "present invention comprises a method and a device for **making an absorbent fibrous web**" |
| MCPAT367 | "to **produce an absorbent web** with an imprinted pattern." |

# "FIBER WEB": SUMMARY

* Within the four corners of the patent, both the claims and specification refer multiple times to the fiber web as being the product that results from the patented manufacturing process.

* Prosecution history supports this definition by defining the fiber web as the material which results from the manufacturing process.

# "FIBER WEB":  K-C'S PROPOSAL

* Unsupported fibrous layer.

* The word "unsupported" appears nowhere in the claims or specification.

* Prosecution history only supports a conclusion that the product *is capable* of being unsupported, not that it *must* be.

# "FIBER WEB":  K-C'S PROPOSAL

* Patent covers a "method for producing an absorbent fiber web which is tear resistant and rollable."

* K-C wants the Court to add an adjective.

* K-C's proposal would effectively change the claim to cover a "method for producing an absorbent fiber web which is tear resistant, <span style="color:red">unsupported</span>, and rollable."

# "FIBER WEB":  K-C'S PROPOSAL

* Adding this claim limitation is inappropriate:

   * *N. Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1290-91 (Fed. Cir. 2000) (Federal Circuit has "repeatedly and clearly held that it will not read unstated limitations into claim language.").

   * *Dayco Prods, Inc. v. Total Containment, Inc.,* 258 F.3d 1317, 1327 (Fed. Cir. 2001) ("Our cases make clear, however, that adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible").

   * *International Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771 (Fed. Cir. 1993) (adding phrase "separate and apart" inappropriate where that phrase did not appear in the patent claim or specification).

# "FIBER WEB":  K-C'S PROPOSAL

* Patent Figures in specification do not help K-C.

* They depict "preferred embodiment" – just one way to conduct the manufacturing process, not the only way.

  * *N. Telecom Ltd.*, 215 F.3d at 1293 ("[The Federal Circuit] consistently declines to construe claim terms according to the preferred embodiment.").

  * *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

* Patent specification, including preferred embodiment, must be clear and unmistakable to limit claims.  *See Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1366-1367 (Fed. Cir. 2012)

# "FIBER WEB": K-C'S PROPOSAL

* Only portion of '702 Patent upon which K-C relies is the Figures.
* But the Figures show that the finished product *is* supported by tension.



FIG.1

# "FIBER WEB": K-C'S PROPOSAL

* Prosecution history only discusses how McAirlaids distinguished its process from the one in the prior art (Dunning) because the much weaker Dunning process produces a product that must "be supported during subsequent manufacturing steps."

* K-C's citations to the prosecution history have no disclaimer of support; they distinguish the prior art based on strength.

# "FIBER WEB":  K-C'S MOTIVE

* The '702 Patent requires a process that imparts enough strength to the finished product that it *is capable of being* unsupported, not that it *must* be unsupported.

    * Prosecution history does not "clearly and unmistakably" limit McAirlaids' claims. *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005).

    * Using prosecution history to limit claims requires a "high standard" with a "clear and deliberate statement[.]" *Honeywell Intern. Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1365-66 (Fed. Cir. 2007).

# "FIBER WEB":  K-C'S MOTIVE

* K-C's manufacturing process allegedly moves the finished absorbent pad onto a conveyor belt where it is then cut and finished into the commercial product, rather than being rolled up for finishing later.

* Next slide is AEO  (Dkt. 42 Ex. 3, C-1)

# K-C'S ALLEGED MANUFACTURING PROCESS

**AEO REDACTED**

# "FIBER WEB": K-C'S MOTIVE

* Attempt to reverse-engineer a finding of non-infringement by claiming an immaterial post-production feature as a claim limitation.

  * Infringers may not evade liability by adding immaterial features. *N. Telecom*, 908 F.2d 931, 945 (Fed. Cir. 1990 ) ("The addition of features does not avoid infringement, if all the elements of the patent claims have been adopted.")

# "FIBER WEB":  CONCLUSION

* Both the claims and specification support McAirlaids' construction.  Best evidence of construction.

* Prosecution history suggests only that the resulting product must be capable of being unsupported.

* Post-production manufacturing features are irrelevant.

# "ROLLABLE"

# ROLLABLE

| CLAIM TERM | K-C'S PROPOSED CONSTRUCTION | MCAIRLAIDS' PROPOSED CONSTRUCTION |
|---|---|---|
| Rollable | May be taken up on a roll | Capable of being rolled |

# "ROLLABLE"

* Claims and the specification use "rollable" to describe a characteristic of "fiber web."

* Prosecution history supports McAirlaids' definition by describing the fiber web as capable of rolling.

# "ROLLABLE": PATENT CLAIMS

| CLAIM | LANGUAGE |
|-------|----------|
| col. 9, ll. 48-49 | "A method for producing an absorbent fiber web which is tear resistant, and **rollable**…" |

# "Rollable":  Prosecution History

| Page | Language |
|------|----------|
| MCPAT338 | McAirlaids initially described the finished product as "capable of rolling" but later simplified to "rollable." |
| MCPAT365 | McAirlaids previously used "roll-able." |

# "ROLLABLE":  K-C'S PROPOSAL

* Depiction of product being wrapped onto a take up roller in Figure 1 is depiction of only one embodiment.  Could be other ways to roll a product.

  * *N. Telecom Ltd.,* 215 F.3d at 1293 ("[The Federal Circuit] consistently declines to construe claim terms according to the preferred embodiment.").

# "ROLLABLE": K-C'S PROPOSAL

* K-C claims that McAirlaids told the Patent Office that the process imparts "sufficient strength to the unsupported fibrous layer that it may be taken up on a roll, and/or laminated with another material layer."

* "And/or" clause undercuts K-C's attempted claim limitation.

# "ROLLABLE":  K-C'S PROPOSAL

* K-C's principal objection to McAirlaids' definition is that "capable of being rolled could mean simply capable of passing through a set of rollers."  (K-C Br. at 13).

    * Belied by meet and confer process.

    * Grammatically incorrect.

# "ROLLABLE":  K-C'S MOTIVE

* K-C focuses on the "take-up roller" for the definition of rollable in order to try to distinguish its manufacturing process from the '702 Patent.

* Next slide is AEO  (Dkt. 42 Ex. 3, C-1)

# K-C's Alleged Manufacturing Process

**AEO REDACTED**

# "ROLLABLE":  K-C'S MOTIVE

* It appears that K-C's line lacks a take up roller. McAirlaids believes K-C may argue that its product may not be taken up on a roll because it has chosen not to put a roll on its line.

# "ROLLABLE": CONCLUSION

* Both parties agree that product need not be rolled, just that it have properties that permit it to be rolled.

* "Rollable" modifies "fiber web" rather than manufacturing process.

* McAirlaids' construction is superior because it does not limit methods for rolling product.
    * Supported by prosecution history and common sense.
    * Avoids gamesmanship.

# "NON-SEPARATING FUSION OF THE FIBERS OCCURS"

# "NON-SEPARATING FUSION OF THE FIBERS OCCURS"

| CLAIM TERM | K-C'S PROPOSED CONSTRUCTION | MCAIRLAIDS' PROPOSED CONSTRUCTION |
|---|---|---|
| Non-separating fusion of the fibers occurs | The fibers are permanently and irreversibly joined together and the fibers lose their individual fiber structure | The fibers which have been pressed onto one another can no longer be individually separated, piece-by-piece, from one another with a dissecting needle |

# START WITH THE PATENT CLAIMS AND THE SPECIFICATION

* **Federal Circuit imposes preferential order.**  Courts should examine, in order, the claim language itself, the specification, and the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

* "On numerous occasions since then, we have reaffirmed that point, stating that '[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).

# START WITH THE PATENT CLAIMS AND THE SPECIFICATION

* **Nowhere** in the '702 Patent do the words "permanent" or "irreversible" appear.  Nor is there language that "the fibers lose their individual fiber structure."

* Relevant portion of Claim 1:

> "[T]he irregularly arranged fibers are pressed onto each other under a pressure in a range between 250 and 600 MPa such that <u>non-separating fusion of the fibers occurs and a fiber web with an embossing pattern is created</u>…"

# THE SPECIFICATION DEFINES THE TERM

* "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).

* "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v Conceptronic, Inc.,* 90 F. 3d 1576 (Fed. Cir. 1996).

* McAirlaids' Proposed Construction: The fibers which have been pressed onto one another can no longer be individually separated, piece-by-piece, from one another with a dissecting needle.

# "NON-SEPARATING FUSION OF THE FIBERS OCCURS"

| SPECIFICATION | LANGUAGE |
|---|---|
| col. 7, ll. 13-15 | "the fibers pressed onto one another can no longer be separated from one another when trying to do so with a dissecting needle." |
| col. 5, ll. 21-22 | After the pre-compression step but before the embossing step "it is entirely possible to remove the fibers individually, piece by piece." |
| col. 5, ll. 31-37 | After the embossing step "the irregularly arranged fibers are pressed onto each other under high pressure, such that a close fusion of the fiber bodies occurs and a fiber web 100 with an embossed pattern is created that will not separate after the pressure is released." |

# THE SPECIFICATION DEFINES THE TERM COL. 5, LL. 29-36

Between the calender rolls **6.1** and **6.2**, the initially loose non-woven is subjected to an array of point-shaped pressure zones, where the irregularly arranged fibers are pressed onto each other under high pressure, such that a close fusion of the fiber bodies occurs and a fiber web **100** with an embossed pattern is created that will not separate after the pressure is released. The roller arrangement can also be termed as "pixel rollers".

* "Close fusion" not "permanent" or "irreversible."
* Will not separate compared to pre-compression process.

# PATENT FIGURES ILLUSTRATE CONCEPT



# FUSION ZONES IN **K-C'S ACCUSED PRODUCT** MIRROR PATENT FIGURES



FIG. 2

# IF THE DEFINITION IS IN THE SPECIFICATION, THAT DEFINITION GOVERNS

* **"Claim language and the specification generally carry greater weight than the prosecution history."** *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1276-77 (Fed. Cir. 2012).

* **"Although the district court was correct in considering the prosecution history, the claim language and specification in this case are better sources for the correct construction."** *Id.*

# PATENTEE ACTS AS HIS OWN LEXICOGRAPHER

* **"[T]he inventor's lexicography governs."** *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

* "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1312-14.

# NO MAGICAL INCANTATION FOR PATENTEE'S LEXICOGRAPHY TO GOVERN

* **"[I]nventors may act as their own lexicographers and use the specification to supply *implicitly* or explicitly new meanings for claim terms …. [A] claim term may be clearly redefined *without an explicit statement of redefinition*."** *Rambus Inc. v. Infineon Technologies Ag,* 318 F.3d 1081, 1088-89 (Fed. Cir. 2003) (emphases added) (internal citations omitted).

* In any event, "[t]he failure to define the term is, of course, not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary." *Bancorp Service, LLC v. Hartford Life Ins. Co,* 359 F.3d 1367 (Fed. Cir. 2004).

# K-C Starts Its Interpretation with the Prosecution History

* Contrary to years of consistent guidance from the Federal Circuit.

* Disavowal must be clear, express, and unambiguous surrender.

* Attempting to improperly add limitations into claims.

* "Permanent" and "irreversible" are referenced only a few times in the 500+ page prosecution history.

* K-C is trying to cherry pick these terms and take them out of context.

# K-C'S PROPOSED CONSTRUCTION PROVIDES NO CONTEXT

* K-C reads terms out of context
  * Terms used to show the bonds can no longer be dissected with a dissecting needle, unlike weaker hydrogen bonds disclosed by prior art (MCPAT366).

As described at page 17, line 21-23, in the lucid fusion zones of the present invention, the fibers can no longer be separated with a dissecting needle. Hydrogen bonded fiber materials can be dissected with a needle. And hydrogen bonds are released in water. The method and device of the present invention achieve a permanent bond in the lucid fusion zones, yielding sufficient strength to make the web roll-able, but retaining high loft regions adjacent the fusion zones.

# "PERMANENT" AND "IRREVERSIBLE" ARE DEFINED IN THE PROSECUTION HISTORY

* "Permanent" is further qualified in the prosecution history (MCPAT368):

In addition, the regions of hydrogen bonding are released by moisture. In contrast, the lucid fusion zones produced by the method and device of the present invention are permanently bonded . The fibers in the fusion zones cannot be dissected with a needle. Neither are the lucid fusion zones lost to moisture.

# "PERMANENT" AND "IRREVERSIBLE" ARE DEFINED IN THE PROSECUTION HISTORY

* Even the terms "permanent" and "irreversible" are conditioned on the bonds no longer being immediately separable by water or no longer capable of being dissected with a dissecting needle.

* "Irreversible" is further qualified (MCPAT365):

only partially abated by the 2 ½ hr. moisturizing, which yields magnified ligning gluing effect throughout the web, and a pattern of moisture releasable, hydrogen bonding. In contrast, the method and fabric of the present invention rely on irreversible fiber fusion in an embossed region to produce good tear strength, high loft, low density, absorbent, but roll-able, webs.

97

# NO UNMISTAKABLE, UNAMBIGUOUS DISAVOWAL

* Prosecution history, in this case, does not trump definition in specification.

* The prosecution history is less helpful than patent language.

* "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

* "Final Product" is '702 Patent as allowed by PTO – only concept to survive is piece-by-piece separation by dissecting needle.

# K-C WOULD HAVE THE COURT CONSTRUE THE CLAIM CONTRARY TO CONTROLLING PRECEDENT

* Should not interpret claims that would make them inoperable. *AIA Eng'g Ltd. v. Maggatteaux Int'l S/A*, 657 F.3d 1264, 1276-79 (Fed. Cir. 2011).

* Cannot impose unattainable, absolute condition contrary to physical reality (i.e., requiring a perpetual and absolutely indestructible bond).

  * Fire-proof or bullet-proof paper bonds cannot exist, and nobody of ordinary skill in the art would understand the term to mean what K-C proposes. 1 ANNOTATED PATENT DIGEST 7:39 (MATTHEWS)(2014).

# K-C WOULD HAVE THE COURT CONSTRUE THE CLAIM CONTRARY TO CONTROLLING PRECEDENT

* *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087-1088 (Fed. Cir. 2009):

    * Displaying data in "real-time" did not require an instantaneous display (non-zero amount of time) even though the specification distinguishes prior art that did not provide "instantaneous" feedback.

    * Court would not allow impossible, unattainable, absolute condition – "Even assuming that transmission happens at the speed of light, it still takes a non-zero amount of time. Thus, what the claims describe as 'displaying real-time data' cannot possibly mean displaying data literally instantaneously…"

    * Important to Court that invention used commercially available technology, that would not be able to display data literally instantaneously; the same is true here, some commercially available technology was used that could never impart indestructible bonds.

# K-C RELIES ON A CONCLUSORY DECLARATION THAT SUPPORTS McAIRLAIDS' POSITION

* Based solely on dictionary definitions; extrinsic evidence is "less reliable" than intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).

* The Beckham Declaration does not even cite to the '702 Patent to support opinions.

* Not even one of the dictionary definitions cited by the Beckham include the words "Permanent" or "Irreversible."

# "NON-SEPARATING FUSION OF THE FIBERS OCCURS": CONCLUSION

* Claims and specification define term; dispositive.

* In any event, Patentee acted as Lexicographer.

* No clear, unmistakable, unambiguous disavowal.

* K-C is seeking to improperly impose a limitation from the prosecution history; K-C's definition has no basis in the '702 Patent.

# "TEAR STRENGTH OF THE FIBER WEB IS AT LEAST 0.12 KN/M"

# "TEAR STRENGTH OF THE FIBER WEB IS AT LEAST 0.12 KN/M"

| CLAIM TERM | K-C'S PROPOSED CONSTRUCTION | MCAIRLAIDS' PROPOSED CONSTRUCTION |
|---|---|---|
| Tear strength of the fiber web is at least 0.12 kN/m | None.  K-C contends there is no possible way to construe the term. | Tensile strength of the fiber web is at least 0.12 kN/m |

# '702 "TEAR STRENGTH" IS SYNONYMOUS WITH "TENSILE STRENGTH"

* Tensile strength is "the maximum force the material can endure before tearing" (K-C Memorandum in Support of Summary Judgment at p. 5, 30-31).

* Tensile strength is measured over the entire width of pad.

* The claims and the specification use the tensile strength measurement of units of force per width "kN/m."

* Prosecution history supports this definition by repeatedly describing the fiber web as having a "tensile strength" of at least "0.12 kN/m."

# '702 "TEAR STRENGTH" IS SYNONYMOUS WITH "TENSILE STRENGTH"

| CLAIMS | LANGUAGE |
|---|---|
| col. 10, ll. 4-5 | "the tear strength of fiber web is at least 0.12 kN/m" |
| col. 10, ll. 59-60 | "the tear strength of fiber web is at least 0.12 kN/m" |
| col. 11, ll. 22-23 | "having a tear strength of at least 0.12 kN/m" |
| col. 11, ll. 34 | "has a tear strength of the fiber web is at least 0.12 kN/m" |

* All references to "tear strength" use the tensile strength measurement of kN/m.

# '702 "Tear Strength" is Synonymous with "Tensile Strength"

| Specification | Language |
|---|---|
| col. 1, ll. 42-52 | Cross reference to Dunning '622 Patent, which specifies tensile strength of 0.09 kN/m |
| col. 2, ll. 33-34 | "the tear strength of the fiber web is at least 0.12 kN/m" |
| col. 2, ll. 56-58 | "The tear strength is dimensioned such that the nonwoven can sag over a length of 0.1 to 1 m without tearing." |
| col. 3, ll. 6-9 | "a tear strength of at least 0.12 kN/m, preferably up to 0.65 kN/m, is achieved." |
| col. 5, ll. 14-18 | "However, the tear strength is sufficient that the nonwoven does not tear when bridging the distance between the end of the strainer belt and the reversing roll…" |
| col. 5, ll. 22 | "The tear strength of the nonwoven is very low, preferably at least 8 N/m wide" |

# '702 Specification Refers to Dunning "Tensile Strength" as "Tear Strength": Confirms Terms are Synonymous

* The '702 Patent cross references the Dunning '622 Patent, confirming that tear strength, as used in '702 Patent, is synonymous with tensile strength:

It is further known from the U.S. Pat. No. 3,692,622 to initially form an irregular cellulose fiber layer and under relatively low pressure to produce a loose non-woven fabric with a low density and tear strength. The loose non-woven is then entered into the gap of an additional pair of calender rolls and embossed with a pattern of point- or line-shaped pressure zones. The result is a soft, absorbent web material with a base weight of about 16.9 to 50.9 g/m². The tear strength of this fiber web is about 0.09 kN/m. Thus, it is a material that tears easily as is the case with facial tissues, for example. The calender pressures applied for this known

col. 1, ll. 42-52

# '702 Prosecution History Confirms Terms are Synonymous



* Prosecution history confirms that '702 Patent and Dunning '622 Patent both refer to tensile strength and measure it in units of force over width.

# DUNNING (K-C'S OWN PATENT) CONFIRMS TERMS ARE SYNONYMOUS

The webs of several of the above examples were comparatively evaluated with conventional products for their strength and tactile properties. These evaluations were made as follows:

### TENSILE STRENGTH

Tensile strength was measured with an Instron tester (Model No. TM–M) on web sample sizes of 0.5 inch x 3 inch). Measurements were made at a cross head speed of 0.067 inch per minute with the samples at 75° F. and a relative humidity of 50%. Tensile strength is reported as grams of load per inch of specimen width.

Dunning '622 Patent col. 8, ll. 42-55

# DUNNING (K-C'S OWN PATENT) CONFIRMS TERMS ARE SYNONYMOUS

60 Fiber orientation in the basic plane of the web prepared as described above is quite random, and, consequently, the web exhibits substantially equal tensile strength in all directions. In particular, the tensile strengths in the machine and cross directions are quite close. The maximum ratio of tensile strength between these directions i.e., the orthotropic strength ratio (OSR), does not generally 65 exceed 1.5 and usually is less than 1.2. As a result, the

Dunning '622 Patent col. 6, ll. 58-62

# DUNNING (K-C'S OWN PATENT) CONFIRMS TERMS ARE SYNONYMOUS

**TABLE II**

| WEB | Basis weight, lbs./ 2,880 ft.² | RSD [1] | ABD | Tensile grams/ inch M.D. | Tensile grams/ inch C.D. | (OSR) | CWV | CRA M.D. | CRA C.D. | C$_f$ |
|---|---|---|---|---|---|---|---|---|---|---|
| Example I | 11 | 0.136 | 0.04 | 169 | 169 | 1 | .59 | | 80 | .272 |
| Example III | 17 | 0.144 | 0.06 | 226 | 222 | 1 | .7 | 73 | 80 | .272 |
| Conventional creped 2 ply bathroom tissue | 17.5 | 0.271 | -------- | 266 | 132 | 1.95 | .45 | 75 | 87 | .233 |
| Conventional creped 1 ply bathroom tissue | 10 | 0.276 | -------- | 228 | 107 | 2.1 | .48 | 70 | 70 | .233 |
| Conventional creped 2 ply facial tissue | 16.5 | 0.251 | -------- | 286 | 168 | 1.7 | .62 | 86 | 83 | .223 |
| Conventional creped 1 play facial tissue | 18 | 0.499 | -------- | 260 | 80 | 3.25 | .38 | 101 | 78 | .225 |

[1] Measurement made only on a single ply of two ply products. Method (A) used for RSD.

As is evident from Table 2, the webs of Examples I and III have essentially equal tensile strength in the machine and cross directions and have low densities. Con- The tensile strengths of the webs in these examples were measured as previously described, and reported as grams/3 inch width. Different tests were used to illustrate the

Dunning '622 Patent col. 9-10

# '702 SPECIFICATION CONSISTENTLY CONFIRMS TERMS ARE SYNONYMOUS

* Like the measurement (kN/m), the specification consistently confirms tear strength, as used in the '702 Patent, is synonymous with tensile strength.

the result is a loose non-woven with low density and tear strength. **The tear strength is dimensioned such that the non-woven can sag over a length of 0.1 to 1 m without tearing.** It can also withstand air pressures that occur during

******

and tear strength. **However, the tear strength is sufficient that the non-woven 2 does not tear when bridging the distance between the end of the strainer belt 8 and the reversing roll 7 to the inlet into the gap between the two additional calender rolls 6.1 and 6.2, which is about 50 cm.**

'702 Patent, col. 2, ll. 56-58, col. 5, ll. 14-18

# '702 Specification Consistently Confirms Terms are Synonymous

* Specification refers to ability of web to hold together and support its own weight without failing during manufacturing process.

* This is a tensile strength property (measuring forces across the entire width of the web).

* Web is not pushed or pulled side to side during the process (which is what tear strength measures):

and tear strength. However, the tear strength is sufficient that the non-woven **2** does not tear when bridging the distance between the end of the strainer belt **8** and the reversing roll **7** to the inlet into the gap between the two additional calender rolls **6.1** and **6.2**, which is about 50 cm.

114

'702 Patent Col. 5, ll. 14-18

# INTRINSIC EVIDENCE CONFIRMS TERMS ARE SYNONYMOUS

* The '702 claims and specification confirm that tear strength is synonymous with tensile strength:

    * (1) Tensile strength measurement (kN/m) quantifying "tear" measurement;

    * (2) References to the Dunning '622 Patent (prior art referenced in specification and prosecution history) indisputably confirms synonym;

    * (3) Strength of web over distance in patent confirms synonym (ability of web to hold together and support its own weight without failing during the manufacturing process).

    * (4) Interchangeable references to tear strength and tensile strength in prosecution history.

# K-C Feigns Confusion

* K-C fails to offer **<u>any</u>** construction.

* K-C's feigned confusion is unavailing:
  * K-C's Dunning '622 Patent confirms synonymous
  * K-C's Non-Infringement Contentions confirms term is capable of construction as tensile strength
  * K-C understands kN/m as used in '702 Patent measures tensile strength (consistent with use of synonym)

  One skilled in the art would know that tear strength as used in the '702 Patent is synonymous with tensile strength.

# K-C'S NON-INFRINGEMENT CONTENTIONS

| and (3) the tear strength of the fiber web is at least 0.12 kN/m. | As set forth in K-C's Invalidity Contentions, "tear strength" renders the Asserted Claims inoperable and invalid under 35 U.S.C. §§ 101 and 112. As one example, "tear strength" is indefinite because, for example, it is not amenable to construction, it is insolubly ambiguous, and the patent and prosecution record (including the claim language, specification, file history, and patents and patent applications in the family of the '702 patent) fail to provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims. |
|---|---|

To the extent "tear strength" is not indefinite (e.g., to the extent it is amenable to construction, is not insolubly ambiguous, and the patent and prosecution record do provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims) and not otherwise invalid, and it means "tear strength," not present. The process used by Beijing Beishute to make the GoodNites® bed mat product does not and never has resulted in a "fiber web" with a "tear strength" of "at least 0.12 kN/m." As explained above, the process used by Beijing Beishute is a conventional formed fluff process, and the tear strength of the pulp in the GoodNites® bed mat product resulting from this type of process is low. Measurements confirm that the tear strength is less than 0.12 kN/m.

K-C has construed "**tear strength**" in the claim to mean "**tensile strength**" in this case

To the extent "tear strength" is not indefinite (e.g., to the extent it is amenable to construction, is not insolubly ambiguous, and the patent and prosecution record do provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims), and it means "tensile strength," not present. The process used by Beijing Beishute to make the GoodNites® bed mat product does not and never has resulted in a "fiber web" with a "tensile strength" of "at least 0.12 kN/m." As explained above, the process used by Beijing Beishute is a conventional formed fluff process, and the tensile strength of the pulp in the GoodNites® bed mat product resulting from this type of process is low. Measurements confirm that the tear

"TEAR STRENGTH OF THE FIBER WEB IS AT LEAST 0.12 KN/M"
IS DEFINITE &
AMENABLE TO CONSTRUCTION

# THE TERM IS DEFINITE

* Patent is presumed valid and definite.

* Patent claims should be interpreted to preserve validity.

* If a patent claim is subject to two or more interpretations, one of which render the claim invalid, the interpretation that preserves the validity of the claim should be adopted.

# THE TERM IS DEFINITE

* Proof of indefiniteness must meet an exacting standard:  infringer must show by clear and convincing evidence that one of ordinary skill in the art could not determine the bounds of the claim i.e., the claims are "insolubly ambiguous."

# THE TERM IS DEFINITE

* If a claim is amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is not indefinite. *Exxon Research and Engineering Co. v. U.S.,* 265 F.3d 1371, 1375 (Fed. Cir. 2001).

# THE TERM IS DEFINITE

* "The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005).

* Artificial constructions and feigned confusion should be ignored.

# THE TERM IS DEFINITE

* "Claim definiteness, however, is not analyzed in a vacuum, but always in light of the specification and drawings of the patent, as well as the teachings of the prior art and of the particular application disclosure."  *Cree, Inc. v. SemiLEDs Corp.,* 2012 WL 975697(D. Del. 2012)(internal citations omitted).

# TERM IS DEFINITE IF MEANING CAN BE ASCERTAINED FROM INTRINSIC EVIDENCE

* Term is definite where, as here, meaning can be **ascertained from references in the written descriptions in patent.**

* *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371-73 (Fed. Cir. 2005).

* In *Howmedica* the Court reversed finding of indefiniteness because a person of ordinary skill in the art would have readily ascertained from specification and prosecution history that term referred to two dimensional rather than one dimensional measurements.

# TERM IS DEFINITE IF MEANING CAN BE ASCERTAINED FROM INTRINSIC EVIDENCE

* In *Howmedica,* references throughout the specification and prosecution history made clear that invention required a very tight fit for the prosthesis, confirming the two dimensional measurement.

* Here, too, the '702 Patent's specification and prosecution history clarify the invention requires a kN/m measurement with sufficient strength across the entire width of the web confirming that this is a tensile strength measurement.

# TEAR/TENSILE SYNONYM CAN BE ASCERTAINED FROM INTRINSIC EVIDENCE

* The '702 claims and specification confirm that tear strength is synonymous with tensile strength:

    * (1) Tensile strength measurement (kN/m) quantifying "tear" measurement;

    * (2) References to the Dunning '622 Patent (prior art referenced in specification and prosecution history) indisputably confirms synonym;

    * (3) Strength of web over distance in patent confirms synonym (ability of web to hold together and support its own weight without failing during the manufacturing process).

    * (4) Interchangeable references to tear strength and tensile strength in prosecution history.

# EXTRINSIC EVIDENCE ALSO SUPPORTS TEAR/TENSILE SYNONYM

* McAirlaids' expert Dr. Murray has opined based on his examination of the intrinsic evidence and the prior art including the Dunning patent that anyone skilled in the art would recognize that "tear strength" as used in the '702 Patent is synonymous with "tensile strength" (See Opening Brief at Ex. G, Murray Declaration at ¶¶ 7-15)

* The inventor Alex Maksimow has testified that he used a colloquial definition of "tear strength" as synonymous with "tensile strength" in the '702 Patent (See Opening Brief at Ex. F, Maksimow Declaration at ¶¶ 3-12)

# MEASUREMENT (KN/M) ALONE IS SUFFICIENT TO ESTABLISH DEFINITENESS

* '702 Patent provides precise numerical measurement of tensile strength (kN/m) which controls.

* *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1372 (Fed. Cir. 2008)(term is definite because it "is tied to highly specific measurements of four very specific chemical compounds.  Far from being insolubly ambiguous, a skilled artisan could determine whether an 'anaerobic condition' was present").

* *Graceway Pharm., LLC v. Perrigo, Co.,* 2011 WL 3206481 (D.N.J. 2011)(finding that measurement stated in patent controlled the definition of a term that was subject to debate as to meaning if viewed without reference to the measurement).

# MEASUREMENT (KN/M) ALONE IS SUFFICIENT TO ESTABLISH DEFINITENESS

* *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.* 648 F. Supp. 2d 1294, 1336-37 (M.D. Fla. 2009)(patent not indefinite because infringer failed to prove by clear and convincing evidence that one skilled in the art could not derive correct measurement from "less than ideal" formulae).

# '702 SPECIFICATION &
# CLAIMS ESTABLISH SYNONYM

* "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v Conceptronic, Inc.*, 90 F. 3d 1576 (Fed. Cir. 1996).

* "[The Federal Circuit] strive[s], where possible, to avoid nonsensical results in construing claim language." *AIA Engineering Ltd., v. Magotteux Intern. S/A*, 657 F.3d 1264 (Fed. Cir. 2011).

* Differing phrases can be treated synonymously if "fairly inferable from the patent." *Bancorp Service, LLC v. Hartford Life Ins. Co*, 359 F.3d 1367 (Fed. Cir. 2004) ([T]he failure to define the term is, of course, not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary.)

# DURING CLAIM CONSTRUCTION ABSURD & NONSENSICAL RESULTS SHOULD BE AVOIDED

* We strive, where possible, to avoid nonsensical results in construing claim language." *AIA Engineering Ltd., v. Magotteux Intern. S/A,* 657 F.3d 1264, 1276 (Fed. Cir. 2011).

* "Construction that renders claimed invention inoperable should be viewed with extreme skepticism. "*AIA Engineering Ltd.* at 1278.

* Rejecting construction of "displaying real-time data" that would require a instantaneous display because it was not possible in reality or practice.  *Paragon Solutions, LLC v. Timex Corp.,* 566 F.3d 1075, 1087-1088 (Fed. Cir. 2009)

# PATENTEE CAN PROVIDE HIS OWN DEFINITION EXPRESSLY OR BY IMPLICATION

* "But where, as here, the specification reveals a special meaning for a term that differs from the meaning it might otherwise possess, that special meaning governs, particularly where it also serves to avoid an inoperable claim construction." *AIA Engineering Ltd.,* at 1278.

* *AIA Engineering Ltd. (*finding that patentee acted as his own lexicographer and used "solid solution" as a synonym for a "ceramic composite" because the ordinary meaning of "solid solution" resulted in non-sensical construction and was not physically possible to produce).

# PATENTEE CAN PROVIDE HIS OWN DEFINITION EXPRESSLY OR BY IMPLICATION

* K-C's asserts that it is "preposterous" that McAirlaids acted as its own lexicographer in defining "tear strength" as synonymous with "tensile strength," (K-C Reply at 6, n.4).

* However, Federal Circuit precedent is clear that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.  Moreover, the specification need not reveal such a definition explicitly, but may do so by implication."  *AIA Engineering* at 1276.

# PATENTEE CAN USE COLLOQUIAL DEFINITION OF TECHNICAL TERM

* "[W]hile the term 'intensity' may have had a specific meaning in the ultrasound lexicography at the time the patent was written, [patentee] has shown that one of ordinary skill in the art at the time of the invention would be able to tell that the patent contradicts that usage and adequately informs the public that the colloquial use of the term 'intensity' . . . applies." *Volumetrics Med. Imaging, LLC v. Toshiba America Med. Sys., Inc.*, 2011 WL 6934603, *11 (M.D.N.C. 2011).

# PATENTEE CAN USE COLLOQUIAL DEFINITION OF TECHNICAL TERM

* "Although 'apparatus volume' was an odd choice of language to describe what the inventor intended to describe, its use was consistent in the claim, in accordance with use in the prosecution history, and it results in coverage of the embodiments disclosed. Although a first reading suggests that Claim 1 was written in error, a closer analysis reflects that it was not." *Hologic, Inc. v. Senorx, Inc.*, 2009 WL 416596 (N.D. Cal. 2009)

# FED. CIR. PRECEDENT UNEQUIVOCALLY ESTABLISHES TEAR & TENSILE ARE USED SYNONYMOUSLY

* The claims, specification, and prosecution history confirm that "tear strength" is synonymous with "tensile strength."  *See Howmedica Osteonics Corp.,* 401 F.3d at 1371-73 ; *Bancorp Service, LLC,* 359 F.3d at 1367.

* To the extent there could be any alleged inconsistency between any ordinary meaning of "tear strength" (when viewed in isolation) and the measurement (kN/m), *AIA*  makes clear that the patentee acted as its own lexicographer and defined tear strength to be synonymous with tensile strength. *See, AIA Engineering Ltd., v. Magotteux Intern. S/A,*  657 F.3d 1264 (Fed. Cir. 2011).

# K-C's Authorities Are Inapposite

* K-C's authorities are inapposite (K-C Reply at 6) because: (1) tear strength is capable of a reasonable construction, (2) there is evidence that the term is consistently used as a synonym for tensile strength, and (3) the term is not irreconcilably inconsistent with the intrinsic evidence.

* In *Chef America* the clear and unambiguous construction in the specification (and even the prosecution history) dictated that the cooking dough and not the oven had to be heated to the range of 400 to 850 degrees. (358 F.3d at 1372). Moreover, there was no evidence of special meaning. (358 F.3d at 1375)

* In *Allen Engineering* the claims and specification created a direct and irreconcilable conflict because the claims stated that a steering box pivoted "its gearbox *only in* a plane *perpendicular to* said biaxial plane," and in direct contradiction, the specification stated that the "gearbox *cannot* pivot in a plane *perpendicular to* the biaxial plane." (299 F.3d at 1349)

* In *Haemonetics*, the court merely remanded for a determination of indefiniteness after finding a direct and irreconcilable conflict between inventor's *own* definitions of "centrifugal unit."

# MCAIRLAIDS'
# AUTHORITIES CONTROL

* Unlike *Allen Engineering* and *Haemonetics*, here there is simply no evidence that McAirlaids has used its own definition inconsistently in the patent documents.

* McAirlaids is not attempting to rewrite claim terms, but is merely asking the court to honor and apply its definition provided in the patent documents. *See, e.g., AIA Engineering Ltd.,* 657 F.3d 1264 ;*Howmedica Osteonics Corp.,* 401 F.3d at 1371-73 ; *Bancorp Service, LLC,* 359 F.3d at 1367; *Hologic, Inc.,* 2009 WL 416596; *Volumetrics Med. Imaging, LLC,* 2011 WL 6934603, *11.

* Viewed in context, there can be no dispute that tear strength and tensile strength are used synonymously and anyone skilled in the art would recognize this fact.

# K-C'S NON-INFRINGEMENT CONTENTIONS

| I | and (3) the tear strength of the fiber web is at least 0.12 kN/m. | As set forth in K-C's Invalidity Contentions, "tear strength" renders the Asserted Claims inoperable and invalid under 35 U.S.C. §§ 101 and 112. As one example, "tear strength" is indefinite because, for example, it is not amenable to construction, it is insolubly ambiguous, and the patent and prosecution record (including the claim language, specification, file history, and patents and patent applications in the family of the '702 patent) fail to provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims. |
|---|---|---|
|   | K-C has construed "tear strength" in the claim to mean "tensile strength" in this case | To the extent "tear strength" is not indefinite (e.g., to the extent it is amenable to construction, is not insolubly ambiguous, and the patent and prosecution record do provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims) and not otherwise invalid, and it means "tear strength," not present. The process used by Beijing Beishute to make the GoodNites® bed mat product does not and never has resulted in a "fiber web" with a "tear strength" of "at least 0.12 kN/m." As explained above, the process used by Beijing Beishute is a conventional formed fluff process, and the tear strength of the pulp in the GoodNites® bed mat product resulting from this type of process is low. Measurements confirm that the tear strength is less than 0.12 kN/m. |
|   |   | To the extent "tear strength" is not indefinite (e.g., to the extent it is amenable to construction, is not insolubly ambiguous, and the patent and prosecution record do provide sufficient clarity to a person of ordinary skill in the art as to the bounds of the asserted claims), and it means "tensile strength," not present. The process used by Beijing Beishute to make the GoodNites® bed mat product does not and never has resulted in a "fiber web" with a "tensile strength" of "at least 0.12 kN/m." As explained above, the process used by Beijing Beishute is a conventional formed fluff process, and the tensile strength of the pulp in the GoodNites® bed mat product resulting from this type of process is low. Measurements confirm that the tear |

# BECAUSE TEAR STRENGTH IS AMENABLE TO CONSTRUCTION  IT CANNOT BE INDEFINITE

* Indefiniteness is not an issue because "tear strength of the fiber web is at least 0.12 kN/m" is amenable to construction.

* To the extent the Court were to address indefiniteness (despite the overwhelming evidence that the term is reasonably discernable), any indefiniteness determination would be premature.

# INDEFINITENESS IS PREMATURE

* K-C's indefiniteness argument is its **third attempt** to improperly short circuit this case and deprive McAirlaids of the right to conduct discovery and prove its case:
  (1)  K-C's Bifurcation Proposal **Denied** (Dkt. 23)
  (2)  K-C's Motion for Summary Judgment **Denied** (Dkt. 54)
  (3)  K-C's Indefiniteness Argument During Markman

   K-C has only produced 311 pages out of 150,000 plus documents and none of its witnesses have been deposed

   The Court should put an end to K-C's gamesmanship.

# INDEFINITENESS IS PREMATURE

* Black letter Federal Circuit law:  Claims must be construed before any determination of validity.  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.,* 346 F.3d 1057 (Fed. Cir. 2003).

* Courts have rejected K-C's tactic as "an attempt at an end run around the court's scheduling order regarding the filing of dispositive motions."  *Pharmasten Therapeutics, Inc. v. Viacell Inc.,* 2003 WL 124149, *2 n.1 (D. Del. 2003).

* Courts generally refuse to address indefiniteness until after the conclusion of fact and expert discovery.  *See, e.g., Waddington N. Am., Inc. v. Sabert Corp,*  2010 WL 4363137, at *2-3 (D.N.J. 2010).

# INDEFINITENESS IS PREMATURE

* McAirlaids has the right to present expert testimony on any patent validity issues (reports not due until October 17, 2014).

* Pursuant to Court's Scheduling Order dispositive motions are not due until November 25, 2014 and will be heard on January 20, 2015.

* K-C can't have it both ways by asking Court to disregard Dr. Murray's testimony and seeking premature indefiniteness ruling.

* McAirlaids has not had the opportunity to depose Mr. Mango.

# "A PAIR OF CALENDER ROLLERS HAVING A PATTERN OF POINT OR LINE-SHAPED STUDS."

# FIGURE 1 OF THE '702 PATENT



Pre-Compression Rollers

A pair of calender rollers each having a pair of point or line-shaped studs

FIG.1

Direction of Manufacturing Process

# INFRINGING GOODNITES



Compressed absorbent core from two patterned rollers

Fusion Zone of Embossed Region

# INFRINGING GOODNITES



# CONCLUSION