1               UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF VIRGINIA
2                 ROANOKE DIVISION

3 **MCAIRLAIDS, INC.,**

4               Plaintiff,

                     **No. 7:13-CV-193**
5    vs.              Roanoke, Virginia
                     **September 15, 2014**
6 **KIMBERLY-CLARK CORPORATION,**
**KIMBERLY-CLARK WORLDWIDE, INC.,**
7 **and KIMBERLY-CLARK GLOBAL SALES, LLC,**

8              Defendants.
            **REDACTED TRANSCRIPT**
9         **TRANSCRIPT OF MOTION HEARING**
      BEFORE THE HONORABLE ROBERT S. BALLOU
10        UNITED STATES MAGISTRATE JUDGE.
**APPEARANCES:**

11

  **For the Plaintiff:**
12 **JOSHUA F.P. LONG**
**JOHN BENJAMIN ROTTENBORN**
13 **FRANCES ELIZABETH B. WALLER**
Woods Rogers PLC
14 10 S. Jefferson St., 14th Floor
Roanoke, VA 24038-4125
15 540-983-7725

16 **For the Defendants:**
                     **KEVIN PHILIP ODDO**
17 **MARC SCOTT COOPERMAN**    LeClair Ryan, PC
**MICHAEL L. KRASHIN**      1800 Wachovia Tower
18 **VICTORIA R.M. WEBB**      Drawer 1200
Banner & Witcoff, Ltd    Roanoke, VA 24006
19 10 S. Wacker Drive, Suite 3000 540-510-3000
Chicago, IL 60606      **JANET MITRIUS**
20 312-463-5000          **VICKI MARGOLIS**

21 Transcribed by:   Carol Jacobs, Official Court Reporter
                  Registered Diplomate, Realtime Reporter
22                 U.S. District Court, 1101 Court Street
                Lynchburg, VA 24504
23                 434-847-5722, ext. 3

24    Proceedings recorded by FTR; computer-assisted
transcription
25

```
 1        (Call to Order of the Court at 10:00 a.m.)

 2           THE COURT:  All right.  Good morning, everybody,

 3    again.  This is Robert Ballou.

 4           Do we now have everybody, I think, on the line that

 5    we need to have on the line from --

 6           MR. LONG:  I believe so, Your Honor.

 7           THE COURT:  All right.  From McAirlaids'

 8    standpoint, Mr. Long, do you have everybody on that you need

 9    to have on?

10           MR. LONG:  Yes, sir.

11           THE COURT:  All right.  And from Kimberly-Clark's

12    standpoint, Mr. Oddo and Mr. Cooperman, do you-all have

13    everybody on that you need to have on?

14           MR. ODDO:  Yes, sir.

15           THE COURT:  All right.  Very well.

16           MR. COOPERMAN:  We do, Your Honor.

17           THE COURT:  All right.

18           Kristin, if you can just call the case, so we can

19    get on the record.  And then we'll --

20           THE CLERK:  All right.  This is McAirlaids,

21    Incorporated, versus Kimberly-Clark Corporation, and others,

22    Action No. 7:13-CV-00193.

23           THE COURT:  All right.  Let the record reflect that

24    all counsel are on line by telephone conference.

25           We're here today on several discovery motions.
```

1    What I have before me are, I believe, two motions filed by

2    McAirlaids as it relates to the privilege log that Kimberly-

3    Clark has provided and also a clawback issue regarding one

4    particular document that I have written about before that we

5    need to address; and then, secondly, is a motion to compel

6    filed by Kimberly-Clark regarding certain documents that

7    were withheld by McAirlaids.

8         Is that everything that -- from a discovery

9    standpoint that I should have in front of me, counsel?

10        Mr. Long?

11        MR. LONG:  Yes, Your Honor, from McAirlaids'

12   perspective that is accurate.  As of today there is another

13   motion that is just ripe that we need to have heard before

14   some upcoming depositions, but we can address that at the

15   end, if it works.  In terms of what is ripe for today, you

16   have described everything that I'm aware of.

17        THE COURT:  All right.

18        Mr. Oddo, on behalf of -- or, Mr. Cooperman, on

19   behalf of Kimberly-Clark, is that everything we need to

20   address today?

21        MR. ODDO:  I think it is, Your Honor.  There are

22   some other discovery issues, again, that we're trying to

23   work out.

24        THE COURT:  Okay.

25        MR. ODDO:  But that is what certainly has been

4

```
 1   briefed, Your Honor.
 2            THE COURT:  Okay.  And if we need to discuss those
 3   at the end of today, then we can certainly take those up.
 4            I think the first issue that was filed was
 5   McAirlaids' issue as it related to the common interest.  And
 6   we -- at that point in time privilege logs had not been
 7   provided, documents hadn't been -- had not been produced,
 8   and we didn't really know exactly what the particular issues
 9   were going to be.  And so we set it off to this date, at
10   which time now we have a better record to be able to
11   discuss.
12            And so, Mr. Long, on behalf of McAirlaids, I'll
13   give you the first opportunity as it relates to the common
14   interest attorney-client work product issues that you have
15   briefed.
16            MR. LONG:  Thank you, Your Honor.  And Mr. Ben
17   Rottenborn is going to handle that on our behalf.  We
18   appreciate the opportunity.
19            THE COURT:  All right.  Mr. Rottenborn.
20            MR. ROTTENBORN:  Thank you, Your Honor.  I will
21   -- I will try my best not to go through argument that we
22   discussed at the August 7th hearing or that has been in the
23   prior briefing on this.  But I agree with Your Honor that I
24   think the issue is now ripe.  And, really, the theme that we
25   keep coming back to is that it is K-C's burden to show that
```

```
 1    the common interest applies, the common interest doctrine

 2    and the joint defense privilege.  And we don't think that

 3    K-C has met its burden.

 4          The briefing that is before you and that was before

 5    you at the August 7th hearing makes clear that both sides

 6    agree that there has to be a "meeting of the minds" -- and

 7    that's K-C's term from the Hunton & Williams Fourth Circuit

 8    case -- on whether or not the joint defense privilege

 9    applies.  That requires two things.  One, it requires, as an

10    abstract matter, that there be a common interest between the

11    parties, or the possibility of a common interest; and, two,

12    that requires that the parties are actually engaged in some

13    form of joint strategy.

14          THE COURT:  There's not any issue, I take it, that

15    there's a common interest as of the date in which they

16    -- they agreed -- or at least -- in which they executed a

17    joint defense agreement, or -- I take it that that's

18    -- there is not an issue beyond that date; is that right?

19          MR. ROTTENBORN:  Correct, Your Honor.  And I think

20    that -- we're not contesting their withholding of any

21    documents dated after September 3rd of 2013, which is the

22    date the common interest agreement was executed.  I do think

23    that as a -- you know, as a hypothetical matter there could

24    be communications after that date that don't relate to a

25    joint defense and that might not be privileged, but we don't
```

```
 1    know of any today and we're not challenging any.  And, in

 2    fact, we're not challenging any dated after, I believe,

 3    ████████████████████████████████████████████████████████

 4    ████████████████████████████████████████████████████████

 5    ████████████████████████████████████████████████████████

 6    that.

 7              It is certainly not our argument that you have to

 8    have a common interest agreement that's executed --

 9              THE COURT:  Right.

10              MR. ROTTENBORN:  -- in order for the joint defense

11    privilege to apply.  But it is our argument that --

12              THE COURT:  Well, that was my next question.

13    Certainly the common interest can arise long before the

14    parties reduce it to writing.

15              MR. ROTTENBORN:  It can, Your Honor, yes.

16              THE COURT:  And so the primary focus is, then,

17    whether or not that interest had been created between

18    Beijing Beishute and Kimberly-Clark at any point in time

19    ████████████████████████████████

20              MR. ROTTENBORN:  That's correct, Your Honor.

21              THE COURT:  All right.

22              MR. ROTTENBORN:  And, in particular, whether K-C

23    has met its burden of showing that that common interest had

24    arisen before that date.  And you have had -- we have now

25    had several rounds of briefing -- two rounds of briefing on
```

```
1    this issue.  And we have had a pretty full argument on the

2    issue on August 7th.  And there hasn't been a single time

3    that K-C has attempted to show you anything by way of any

4    sort of evidence or proof or affidavit from counsel or

5    anything that there was a common interest and that the

6    parties were engaged in a joint legal strategy in defending

7    this lawsuit.

8            On Friday --

9            THE COURT:  Does it have to relate just to this

10   lawsuit or could it relate to the trademark issues that

11   existed between the parties at that time?

12           MR. ROTTENBORN:  I think it has to relate just to

13   this lawsuit if they want to claim joint defense privilege

14   and a common interest as to defending this lawsuit.  So to

15   the extent that that common interest agreement is --

16           THE COURT:  Are you -- so if they had a common

17   interest as it related to the trademark issue and there

18   wasn't an issue that -- and let's just assume for a minute

19   ████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   was a common interest at that time as it related to the

24   trademark issue, they couldn't -- they would still have to

25   produce -- produce documents that -- in this case that may
```

```
 1   be protected from discovery in the other case?
 2            MR. ROTTENBORN:  Well, in this instance I believe
 3   they would.  I think, Your Honor, to the extent that there
 4   may be documents that relate to both cases, perhaps not.
 5   But I think that in a trade dress case there is no issue of
 6   a plant inspection by the plaintiffs of the plant where the
 7   allegedly infringing product is made.  In a patent suit
 8   there is.
 9            THE COURT:  Right.
10            MR. ROTTENBORN:  So the emails that we're
11   challenging here relate only to the patent case, not to the
12   trade dress case.  So I think that whether there's a common
13   interest with respect to the trade dress case ongoing as of
14   July 1st, 2013, that doesn't shield these documents.
15            THE COURT:  Was Beijing Beishute a potential
16   defendant in the patent case, as a manufacturer?
17            MR. ROTTENBORN:  As a manufacturer, yes, they are
18   -- they were a potential defendant, although we have -- I
19   think -- we're not going to sue them.  McAirlaids has no
20   plans to sue them.  And I think -- I'm not sure if that has
21   been stated on the record.  But they are not -- you know,
22   they are not a defendant and we're not going to be suing
23   them.
24            THE COURT:  But at that time they were -- and I
25   guess they still are always a potential defendant.  You may
```

1   make a legal decision from a strategy standpoint that you

2   don't want to sue them for many different reasons, not the

3   least of which is that being a Chinese corporation that it

4   complicates things procedurally getting them in the case and

5   managing the case from their perspective.  But they're -- as

6   a potential patent infringer, I guess is another way of

7   putting it, by virtue of manufacturing the product in

8   violation of your patent makes them a potential defendant.

9          MR. COOPERMAN:  Your Honor, can I ask you to speak

10   up just a little?  We're having a hard time hearing you in

11   Chicago.

12          THE COURT:  I'm sorry.  I was leaning back.  I'm

13   sorry, Mr. Cooperman.

14          But as the manufacturer of the product, it makes

15   them a -- it makes Beijing Beishute a potential defendant in

16   a patent case.  There may be a strategic reason not to sue

17   them, but you could have otherwise sued them as a patent

18   infringer; is that right, Mr. Rottenborn?

19          MR. ROTTENBORN:  I don't believe that's right, Your

20   Honor.  I think as a manufacturer of a product overseas

21   that's not a basis for an independent lawsuit in the United

22   States against them.

23          THE COURT:  Okay.

24          MR. ROTTENBORN:  And I know that K-C will argue --

25          THE COURT:  I don't know.

1    MR. ROTTENBORN:  -- that there's some sort of

2  indemnification provision in the supply agreement between

3  K-C and Beijing, but that's not something that relates to

4  McAirlaids.  And that's not -- they could not have been a

5  proper defendant in this lawsuit.

6    THE COURT:  Okay.  All right.

7    MR. ROTTENBORN:  So it is our position that K-C

8  hasn't met its burden of showing that the parties were

9  engaged in a joint legal strategy as of July 1st.  They sent

10  -- K-C sent you a document on Friday that purports to, I

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  insufficient to establish the common interest.  Just mere

15  knowledge of a lawsuit by a potential common interest

16  partner isn't enough to establish that the parties are

17  actually engaged in a joint defense strategy.

18    Now, we have argued in the past that the absence of

19  that information -- in other words, the fact that there was

20  no evidence that BB even knew of the lawsuit -- precludes

21  any argument for a joint defense privilege.  But the flip

22  side of that isn't necessarily true, that the -- the fact

23  that Beijing knows of the lawsuit now establishes that there

24  is an ongoing joint defense.

25    And so what the bottom line -- I won't belabor the

1   point -- is:  K-C hasn't met its burden of showing when the

2   joint defense privilege applies.  Maybe these documents that

3   they are trying to withhold -- I don't know if those

4   establish that or not.  But I think a review by the Court

5   will be necessary in order to determine whether or not they

6   do.

7           THE COURT:  All right.  Okay.

8           I know that there are a number of other objections

9   that you had with respect to the privilege log as it related

10  to either items that were not properly part of the

11  attorney-client privilege or that are not otherwise work

12  product.  Is there anything you want to -- anything else you

13  want to add to those arguments?

14          MR. ROTTENBORN:  Your Honor, I'll add one more

15  thing as it relates slightly to the joint defense argument.

16  And this is from section -- from the brief that we filed on

17  the 10th.  This would be from Section 2.  And it is that

18  there are a few documents dated before July 1st, 2013, that

19  also are communications that appear to be with Beijing.

20  Now, McAirlaids -- or K-C doesn't claim the joint defense

21  privilege for those documents, but they are still

22  withholding those.  I'm not sure that they can.  And I'm not

23  sure why they would be withholding those on any basis other

24  than joint defense.  So certainly -- like, for example,

25  entry number 428 is something that we would take issue with

1   to the extent that they are suggesting that, you know,

2   because it is a communication with BB that it is somehow

3   privileged.

4           Now, Beth Waller is going to address several of the

5   other issues related to the privilege log that don't have to

6   do with joint defense, so we'll defer to you on when you

7   want us to go through those.  But with respect to joint

8   defense, there's sort of the July 2nd and 3rd bucket of

9   communications and then there's a few communications

10  identified in Section 2 of our brief from pre-July.  And, in

11  fact, those are from before Beijing even learned of the

12  patent suit.

13          THE COURT:  Okay.

14          MR. ROTTENBORN:  So that's all I have on joint

15  defense, subject to any questions Your Honor has.

16          THE COURT:  I don't have any other questions.

17          Ms. Waller, why don't you go ahead.  I'll get

18  everything -- what I thought I would do is we'll just handle

19  the argument as it relates to the Kimberly-Clark privilege

20  log in total, and then I'll have Kimberly-Clark argue that.

21  Then we'll argue the clawback issue separately.  And then

22  we'll argue Kimberly-Clark's motion as it relates to

23  McAirlaids' documents separately.  That way we can kind of

24  keep some sense of order as we go through this.

25          So Ms. Waller.

1          MS. WALLER:  Sure, Judge.  That makes sense to me.

2          I think there are three additional categories --

3     broad categories of documents that we take some issue with

4     off of the Kimberly-Clark privilege log.

5          The first would be those documents that are merely

6     reflecting legal advice between nonattorneys and not

7     conveying legal advice.  We would argue that those, under

8     the Fourth Circuit, do not qualify as attorney-client-

9     privileged communications.  And, of course, in our brief we

10    went through the *ePlus* and *Deel* decisions.  You know,

11    anytime a client does something an attorney says to do would

12    be privileged if you were allowed to shield documents that

13    merely reflect legal advice rather than request or, you

14    know, relay legal advice, I think, under those theories.

15          In *ePlus* Judge Payne in Richmond held that for

16    entries that defendants had logged that were just reflecting

17    legal advice between nonattorneys, those were not

18    communications from or to an attorney that would qualify as

19    attorney-client-privileged.

20          Similarly in *Deel*, Judge Turk considered a number

21    of different documents that were withheld.  And there he

22    held that where documents were not created for the purpose

23    of primarily securing legal advice or giving legal advice,

24    they were not privileged.  And if it was another document,

25    you know, that was basically facilitating a business

1   decision versus providing or securing legal advice, it was

2   also not privileged under Judge Turk's analysis in *Deel*.

3          A number of the entries on K-C's log are made by

4   nonattorneys to nonattorneys.  They are not described as

5   seeking or conveying legal advice, but, instead, as

6   reflecting legal advice.  And there's a difference on K-C's

7   logs between those -- you know, they do use descriptions

8   where it is conveying or providing legal advice.  These are

9   different from that, reflecting legal advice.

10         And there's a number of examples that we went

11  ████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████

18  business decisions and business advice, not to the provision

19  of legal advice.  So that would be an example of these

20  reflecting-legal-advice documents that we would say are

21  properly withheld on the basis of attorney-client privilege.

22         THE COURT:  Do we know -- I guess the term

23  "reflecting" can be interpreted in many different ways.  Do

24  we know what the term "reflecting" means as used in this

25  particular privilege log?

```
 1              MS. WALLER:  Judge, I would say that -- you know, I
 2   would have to ask Kimberly-Clark that question.  I would say
 3   that, you know, there's a couple of issues.  I think that,
 4   as I said, there's a number of descriptions where the
 5   descriptor is providing legal advice or relaying legal
 6   advice, you know, between nonattorneys.  And we haven't
 7   taken issue with those -- those -- you know, that wording in
 8   those descriptions.  We think that that's probably an
 9   accurate reflection of what is going on there.  But if it is
10   just merely reflecting legal advice, you know, that is to
11   say just applying the legal advice, not actually conveying,
12   you know, "This is what counsel said for" -- you know, "for
13   us to do on this issue," then that would not be
14   attorney-client-privileged.
15              THE COURT:  Okay.  It is a question that I'm going
16   to ask Kimberly-Clark as to what it means, because you are
17   right; the way in which Judge Payne has dealt with that, and
18   Judge Turk, indicates that there must be some provision of
19   legal advice for -- along the way as opposed to whatever the
20   term "reflecting" may mean, and we'll figure that out.
21              MS. WALLER:  Exactly.  And I think Judge Sargent
22   really hit it on the head too in the *Adair* case, which we
23   don't really deal with in this context.  But, you know, here
24   we're dealing with a corporation that has, you know, big
25   in-house counsel.  And in that instance you have really got
```

1   to examine the documents and determine whether or not they

2   are business advice or legal advice, because it is a lot

3   more difficult in an in-house -- you know, in this

4   in-house-counsel context to determine whether these are the

5   provisions -- you know, this is a provision of legal advice.

6           So that would be the issues that we have with the

7   reflecting-legal-advice category.

8           THE COURT:  All right.

9           MS. WALLER:  The other -- another category that we

10  are challenging are emails where you are just copying an

11  attorney on a large chain of documents or a large -- you

12  know, you send an email to 30-plus employees and you copy

13  legal counsel.  And it is not that the email -- at least

14  based on the descriptions in the log, which is the only

15  thing that we really have to go on here, it is not that the

16  email is addressed to, you know, Joe Smith lawyer, and it

17  copies 30 people, which we could -- you know, there is case

18  law in the Eastern District that says that that could be an

19  issue in and of itself.  But these folks are seen to be

20  copied on a business email, you know.  And they are just

21  copying, you know, in-house or outside counsel on a

22  business, you know, email chain.  And that would not, of

23  course, rise to the level of attorney-client privilege,

24  because, again, it is this conveyance of legal advice,

25  securing of legal advice back and forth, that is important.

1     In addition, in *ePlus* Judge Payne also provided

2     some guidance in this context.  And he said where you have

3     ten or more nonattorneys on an exchange, an email exchange,

4     that does kind of raise a question as to whether this is for

5     the provision of legal advice.  And it is on a -- you know,

6     Judge Turk in *Deel* discussed the need-to-know test and the

7     *Upjohn* test.  And both Judge Payne and Judge Turk discussed

8     those in *Deel and ePlus*.

9     In order to withhold these documents, K-C must

10    prove that the alleged attorney-client advice was

11    disseminated to people within K-C who needed to know the

12    information.  And under *Upjohn,* K-C must prove that the

13    communication was made by employees to legal counsel for a

14    corporation, acting as legal counsel at the time of the

15    communication, for the purpose of securing legal advice.

16    And we would -- we would posit, Judge, that K-C has not met

17    its burden.

18    An example of this, to look at kind of a real

19    example in K-C's log, would be entries 124 and 125, which



25    of the email, but rather merely included as a copy

```
 1    recipient, a carbon-copy recipient on an email exchange.

 2            And a review of the unredacted portion of entry 124

 3    shows that it is just a call with him to discuss business

 4    matters with the theories of redaction.  And so, you know,

 5    we're trying to utilize both the description in K-C's log

 6    and, where possible, unredacted portions of the documents to

 7    show that these -- you know, a lot of these are being

 8    withheld, you know, on the basis of attorney-client

 9    privilege, but they are not providing legal advice, but,

10    instead, discussing business matters between large numbers

11    of nonattorneys, copying an attorney.  So we would posit

12    that those are improperly withheld and that they should be

13    produced.

14            And then finally, Judge, to go mere through these,

15    the final category that we have is these Dean Leonard

16    documents, this third-party consultant, Mr. Leonard, who in

17    varying ways on K-C's logs is described as an employee and

18    as -- and a consultant.  We, through Google sleuthing and

19    finally through the meet-and-confer process, have determined

20    that Mr. Leonard is a third party, not a K-C employee.  He

21    consults for a company called Phototype, which is an

22    independent global branding company.

23            THE COURT:  Is it fair to say that --

24            MS. WALLER:  And it is clear to us --

25            THE COURT:  -- he was never a K-C employee?
```

```
 1              MS. WALLER:  Well, it appears, based on our
 2   meet-and-confer, that he was a former K-C employee, but not
 3   at any of the time of these entries was he ever a K-C
 4   employee.  He was a former employee, then he worked for
 5   Phototype.
 6              THE COURT:  Okay.
 7              MS. WALLER:  So, on the log, with the entries that
 8   we're challenging, we understand that he at all times was a
 9   third-party consultant and not a K-C employee.
10              THE COURT:  And he worked for a branding company?
11              MS. WALLER:  But then we -- we would say that he
12   was not a consultant for purposes of litigation.  He --
13              THE COURT:  He worked for a branding company?  Is
14   that correct?
15              MS. WALLER:  Yes, Judge.  Yes.
16              THE COURT:  And they were helping to create the
17   brand for this particular product, for GoodNites?
18              MS. WALLER:  GoodNites, yes, Judge.
19              And it is unclear to us how he could be seeking,
20   you know, legal advice as a third-party, you know, from
21   Kimberly-Clark or, you know, be involved in any sort of
22   attorney-client relationship such that the attorney-client
23   privilege would be proper here.
24              And, again, you know, I don't think that just
25   because you -- you're a third party in a contract
```

1    relationship, you know -- you know, you're in a contract

2    relationship with one of the parties in a case, that doesn't

3    give rise to some sort of blanket privilege over your

4    communications.  If that was the case, we wouldn't be

5    fighting over these BB documents or Medline documents,

6    because they are contract relationships too.

7              So we don't see how Mr. Leonard, you know, is

8    situated in some special status such that he should have

9    -- you know, be designated as attorney-client-privileged

10   communications, or his entries on the log.

11             THE COURT:  Okay.  All right.

12             Now, you have -- basically, there are five broad

13   categories that have been identified.  We have this joint

14   defense privilege is one; I guess there's some documents in

15   Section 2 of your brief that Mr. Rottenborn talked about;

16   and then you have talked about three areas that were

17   reflecting legal advice, some of which are business

18   decisions or --

19             MR. COOPERMAN:  Your Honor, I'm sorry.  This is

20   Marc Cooperman again.

21             THE COURT:  I'm sorry.  I was leaning back again.

22   I'm sorry, Mr. Cooperman.

23             MR. COOPERMAN:  Thank you.

24             THE COURT:  The three other areas reflecting legal

25   advice, some of which reflect business depositions, some of

```
 1    which reflect communications between nonattorneys; and then
 2    the next area is copying legal counsel; and then Dean
 3    Leonard.
 4            In your meet-and-confer, Ms. Waller, have you all
 5    been able to -- is there general agreement as to what
 6    documents fall into what category or am I going to have to,
 7    in addressing McAirlaids' motion, identify which documents I
 8    either grant the motion as it relates to or deny the motion
 9    as it relates to?
10            MS. WALLER:  Judge, in our opinion, we have
11    narrowed significantly our issues from a plethora of them to
12    these five, during the meet-and-confer process.  And what we
13    have tried to do -- there is an exhibit to our brief that we
14    have tried to identify those entries that fall into those
15    broad categories by number on our exhibit, a chart of sorts,
16    in order to try and make that a little bit easier.
17            THE COURT:  Right.
18            MS. WALLER:  But, you know, beyond that, in terms
19    of whether this -- you know, I don't think that we have
20    explicitly gone through and said, "Well, this document
21    number, you know, X, Y, Z, falls within this category or
22    that category with K-C."  We have addressed the broad
23    issues.  There were a large number of entries on K-C's log,
24    4,000 plus.  And we have narrowed it down to these five
25    categories with, you know, perhaps a hundred documents
```

1    within them.

2              THE COURT:  Right.  Okay.

3              All right.  And I -- and I have seen that.  And

4    we'll find out whether K-C agrees with particular documents

5    or wants to pull out particular documents and talk about

6    them in that regard.

7              Okay.  Anything else, Ms. Waller?

8              MS. WALLER:  No, Judge.  I believe that's it from

9    our side.

10             THE COURT:  All right.

11             All right.  Mr. Cooperman.

12             MR. COOPERMAN:  Yes, Your Honor.

13             So should we start with the common interest

14   privilege?

15             THE COURT:  Let's start with the common interest

16   privilege.  Maybe we can work through it in the same order.

17             Let me ask you the same question where I ended.

18   And I'm going to write something here at the end of the

19   hearing today.  And I want to be able to do so in a way that

20   is meaningful to the parties on both sides and so that I do

21   have -- I do provide clarity.

22             I know that Exhibit B to McAirlaids' brief uses

23   these five general categories.  Are those categories and the

24   documents that are nested within those categories -- are you

25   able to argue along those lines; or do I need to identify

```
1    specific documents as we go -- as I write my opinion?

2              MR. COOPERMAN:  Your Honor, I think I understand

3    what you are saying.  And, broadly, I think that the chart

4    that is Exhibit B that I believe Ms. Waller was talking

5    about --

6              THE COURT:  Right.

7              MR. COOPERMAN:  -- organizes the documents in a way

8    that can be understood.  I'll say that a lot of the

9    arguments that were made in the briefs about those documents

10   were arguments that had not previously been raised at our

11   meet-and-confer.  I don't know that that impacts whether

12   Your Honor wants to rule on these, you know, at the end of

13   the day or not.  But as far as organization goes, I

14   understand what they are arguing.

15             THE COURT:  Okay.

16             MR. COOPERMAN:  I will understand what documents

17   are being referred to.

18             THE COURT:  Okay.  All right.  Very good.

19             Let's talk about the joint defense privilege.

20             MR. COOPERMAN:  Okay.  So I think Mr. Rottenborn's

21   principal argument was that we have failed in our burden to

22   show that the common interest exists.  And I just want to

23   back up.  And it seems as though McAirlaids' arguments have

24   been changing over time.  First McAirlaids argued, way back

25   at our first hearing, that there had been no evidence
```

```
 1    whatsoever that there was a common interest.  And then when
 2    we provided the log, our document log that you have seen, we
 3    had detailed entries that explained that there were
 4    discussions about the lawsuit and the joint defense.  So
 5    there was evidence there.  We sent representations from
 6    counsel in an email that there had been communications
 7    between Kimberly-Clark's counsel and Beijing's counsel about
 8    joint defense of the lawsuit as far back as July 2nd.
 9            And then when we saw their brief on Wednesday for
10    the first time, again their argument changed.  And now it
11    wasn't there wasn't any evidence; it was there wasn't any
12    written evidence.  So we submitted on Friday the letter Your
13    Honor referred to, the July 2nd redacted letter, to say,
14    "Yes, there is written documentary evidence.  If you are not
15    going to take our representations verbally, if you are not
16    going to take our log representations, look at this letter."
17    And so we have responded to that.
18            And now their argument has changed again.  And I'm
19    not 100 percent following it, Your Honor, other than we have
20    now provided, I think, evidence -- substantial evidence that
21    there was a meeting of the minds that BB, as of July 2nd,
22    knew of the lawsuit; that there were discussions at that
23    time, going forward, about joint defense and coordinating
24    litigation strategy.
25            So I think that first complaint by McAirlaids has
```

 1   been addressed numerous times in numerous ways.  And I think

 2   we have more than carried our burden.

 3        THE COURT:  And the joint defense of the common

 4   interest, is Mr. Rottenborn right, it springs out of this

 5   supply agreement and any indemnification obligation that may

 6   exist?

 7        MR. COOPERMAN:  I think it springs out of a couple

 8   of things.

 9        THE COURT:  Okay.

10        MR. COOPERMAN:  I think, one, there's a joint and

11   legal interest that BB is involved in as a result of the

12   supply agreement and the potential indemnification that BB

13   has for -- to defend and indemnify K-C in this lawsuit.

14        There is also the second interest that Your Honor,

15   I think, correctly identified, legal interest, that

16   McAirlaids' counsel initially agreed with you and then, I

17   think, changed their mind, I think that BB clearly is a

18   potential defendant in this lawsuit, regardless of whether

19   they are manufacturing overseas.  As you may recall from

20   prior briefing, section 271(g) of the patent statute allows

21   a manufacturer overseas to potentially rise to liability in

22   this lawsuit.  And McAirlaids has chosen not to pursue that.

23   But that circles right back to your question about what are

24   the forces of potential legal interest, and that is BB could

25   be on the hook for potential infringement and could be on

```
 1    the hook for indemnification and defense.

 2              THE COURT:  All right.  Okay.

 3              I will look back again at that letter as I make my

 4    decision on that.

 5              Anything else on joint defense?

 6              MR. COOPERMAN:  Thank you, Your Honor.  Give me one

 7    second.

 8              THE COURT:  Okay.

 9        (Pause.)

10              MR. COOPERMAN:  I don't -- I don't think so, Your

11    Honor.  Everything else, I think, is in our briefs.  And

12    Your Honor clearly has read everything.

13              THE COURT:  All right.  Very well.

14              MR. COOPERMAN:  Should I move on to the three

15    additional documents?

16              THE COURT:  Yes.

17              MR. COOPERMAN:  Those -- those actually are a

18    result of an error in our log.  And I apologize for the

19    error, Your Honor.  I have to say that I'm not sure, in my

20    25 years of practice, I have ever seen a 1400-page

21    document -- privilege document log before.  We put a lot of

22    effort into this.  And there have been some typos that we

23    have discovered.  And these are a few of the mistakes.

24              As it turns out, the first documents that

25    McAirlaids complains about are privilege document number
```

1   428, I believe, which is one that has already been produced

2   in this lawsuit.  And I can give McAirlaids' counsel Bates

3   numbers, if it wants to, Your Honor.  It is in our off-line.

4         And the other two documents, privilege documents

5   number 2222 and 2224, were incorrectly identified as

6   documents that were sent to BB.  What they were were drafts

7   of letters that we were considering sending to BB.  And

8   those drafts were exchanged in-house among counsel.  And the

9   drafts weren't sent to BB.  So the privilege on those comes

10  from the internal attorney-client privilege discussion.

11        THE COURT:  All right.  So they never left

12  Kimberly-Clark's -- well, did they go out to the business

13  folks for comment and then circulate between the business

14  people and the legal department or did they always stay

15  within the legal department?

16        MR. COOPERMAN:  I believe those -- and, Your Honor,

17  I could pull the documents quickly, if you want me to here.

18  But based on my notes, I believe that they were just

19  internal K-C attorneys talking about the draft letters.

20        THE COURT:  Okay.  All right.

21        Well, I'll have -- I'll have either Mr. Rottenborn

22  or Ms. Waller talk about that, as to whether they --

23        MR. COOPERMAN:  Okay.  And, actually, I have been

24  reminded here that there was at least one K-C business

25  person on the letter.  I think that is described as

1   Mr. Morris.  But it was mostly attorneys.  And the drafts

2   didn't go outside of K-C.

3              THE COURT:  Okay.  All right.

4              MR. COOPERMAN:  Should I move on to "reflecting"?

5              THE COURT:  Yes.  What does "reflecting" mean?

6              MR. COOPERMAN:  Well, I think "reflecting" means

7   conveying.  It means summarizing.  It means passing along

8   the legal advice of counsel or questions from counsel in

9   order to provide legal advice.

10             So there are a number of differing descriptions in

11  the log.  I think they are potentially synonyms where we say

12  "reflecting"; sometimes we say "conveying."  And I think

13  those all mean the same thing and are intended to mean the

14  same thing.

15             And, again, as just a footnote for Your Honor, I

16  think the difference in description, in part, at least, is

17  due to the fact that a number of folks, different folks

18  here, worked on putting together the log.  So each part

19  isn't quite identically worded, despite our better efforts.

20             THE COURT:  All right.

21             MR. COOPERMAN:  And then on the actual substance

22  -- this is very similar, I believe, to Your Honor's ruling

23  on the intellectual asset strategy document in the trademark

24  case, where you recognized that conveying internally

25  counsels' advice between business people can be privileged.

```
1    Of course it can be privileged, when you are actually

2    transmitting the privileged communications from one business

3    person to another business person.  It is no different than

4    any other situation like that or like the one that you ruled

5    on.

6         I believe that the cases that McAirlaids cited are

7    not particularly helpful.  And I can give you just a couple

8    thoughts on those, Your Honor --

9         THE COURT:  Well, let me ask you.  In the -- and I

10   guess -- and I don't know whether I morphed into the issue

11   of whether it goes to many, many different people -- just

12   looking at 124, for example, where you have a whole host of

13   folks who receive the communication, is there anything in

14   the record in which I would know that these folks are in

15   the, quote, need-to-know category of receiving legal advice?

16        MR. COOPERMAN:  Well, a couple responses, Your

17   Honor.  First, I believe that in the record right now are

18   the descriptions in the privilege log with regard to what

19   the documents obviously deal with.

20        THE COURT:  Right.

21        MR. COOPERMAN:  So persons who are attorneys are in

22   the record.  And that one in particular, Mr. Fieldhack,

23   Randy Fieldhack, is in-house counsel for K-C.

24        The issue with regard to needs to know, Your Honor,

25   that you asked about, is an interesting one because -- and I
```

1  may be mistaken about this, but I don't believe McAirlaids

2  has raised that before.  I don't believe it was raised in

3  their brief and -- as an issue.  And so -- and, you know,

4  I'm right now on the hearing -- at the hearing, I can't say

5  that I have gone through and identified whether every

6  business person on there is someone who is a, quote/unquote,

7  needs-to-know person or whatever that standard is

8  specifically in the Fourth Circuit.

9         But I can tell you from looking at the names, I

10  certainly recognize many, many names as folks that

11  McAirlaids' counsel should recognize as being heavily

12  involved in this lawsuit.  But I'm not in a position to be

13  able to represent to you right now whether every single

14  person is within need-to-know.

15         And this is just not an issue that has been briefed

16  before.  And if Your Honor is interested in it, I would ask

17  that we be permitted to brief it.

18         THE COURT:  Okay.

19         And I don't know whether I need additional briefs.

20  I mean, I want to -- what I want to try to do is to get an

21  answer out to you-all as quickly as possible so that our

22  schedule does not get impacted by my delay in getting a

23  response to you-all before you take depositions and things

24  along those lines.  So I'm not sure I need additional briefs

25  at this time.

```
 1              MR. COOPERMAN:  All right, Your Honor.  I would
 2   just ask for an opportunity -- if you feel that you are
 3   going to rule on an issue that we haven't put anything in
 4   writing on, and the need-to-know is one, I would ask for an
 5   opportunity at least to submit something in writing to you,
 6   if that's an issue that you are caring about.
 7              THE COURT:  Okay.
 8              MS. WALLER:  Judge, if I may just jump in on that
 9   point very quickly and say that we did brief the issue of
10   need-to-know in our brief and it was on page --
11              THE COURT:  Ms. Waller, Ms. Waller, I'm going to
12   give you a chance to respond.  Okay?
13              MS. WALLER:  Thanks, Judge.
14              THE COURT:  I want to try to handle this just as
15   though you-all were here.
16              So go ahead, Mr. Cooperman.
17              MR. COOPERMAN:  Yeah.  And I may have also been too
18   narrow in my description on the need-to-know standard, Your
19   Honor.  And I didn't mean to suggest only persons involved
20   in the lawsuit, you know, business folks would fall within
21   the need-to-know category.  There are a bunch of business
22   people who have been involved in the underlying issues, both
23   directly and indirectly in the lawsuit.
24              THE COURT:  Okay.
25              MR. COOPERMAN:  So on the "reflecting" issue, which
```

1    is where I think we were, the *Brainware* case that McAirlaids

2    cites is not particularly helpful here.  First, the court

3    there found that the underlying communications themselves

4    didn't contain privileged subject matter.  So the fact that

5    they reflected materials that weren't privileged to begin

6    with is just not relevant here.  Or they reflected legal

7    advice, but it was legal advice from, again, a third-party

8    counsel that wasn't involved in a common interest that the

9    court had already found.  So, again, that case just does not

10   help forward the decision here.

11          And the *Eastlux* case, again, on "reflecting" -- I

12   had the same question, after reading that case, that Your

13   Honor posed here, which was what does "reflecting" in that

14   decision mean?  And if "reflecting" in that decision means

15   conveying and repeating and quoting the legal advice from

16   one lawyer, then I would submit that that case is wrongly

17   decided.  If "reflecting" means something else, if it means

18   somehow applying it and not actually conveying some legal

19   advice between business folks, well, then it doesn't -- that

20   is not our situation if that is what's going on here.

21          THE COURT:  Okay.

22          MR. COOPERMAN:  And then the -- again, the *Deel*

23   decision that was cited to, it appears that *Deel* was made,

24   again, solely to documents that refer to a business decision

25   and that weren't involved in conveying or providing legal

1   advice.  And I think that is what the Court concluded there.

2   So, again, not helpful.

3          THE COURT:  Do I need to -- do I need to look at

4   the particular documents to be able to make -- make my

5   decision as to whether these relate to, for example, just

6   purely business advice, as McAirlaids suggests may be in

7   some of these documents, whether it is reflecting in a

8   -- I'll call it a low-level manner of passing along legal

9   advice as opposed to the conveying, the seeking out of legal

10  advice that clearly falls in the wheelhouse of attorney-

11  client-type matters?  Do I need to look at the documents?  I

12  don't want to, but I need -- I would be interested in your

13  thoughts as to whether, to be able to get this answer right,

14  from your client's perspective, do I need to look at them?

15         MR. COOPERMAN:  Yeah, Your Honor, I don't think you

16  need to review the documents.  We spent a lot of time trying

17  to provide detailed entries.  We actually had two long

18  conversations with McAirlaids' counsel, where they raised a

19  number of complaints.  And we revised our entries and

20  provided more detail in our entries.  And particularly on

21  this "reflecting" issue -- and I don't think I mentioned it,

22  Your Honor, many -- again, many of McAirlaids' arguments are

23  new arguments.

24         They had previously raised "reflecting" with regard

25  to a couple documents -- or one document during our phone

1  call.  And now, for the very first time, they are raising

2  these additional complaints that are in the log.  And so we,

3  again, could have gone back, looked at the documents and

4  provided more detail.  And I'm sure it was an oversight on

5  McAirlaids' counsels' part, but we haven't really had a fair

6  opportunity to, I guess, provide more detail should more

7  detail be needed, which I don't think -- I don't think it

8  is.

9          THE COURT:  Okay.  All right.

10          I'll look at it.  If I need more detail, I'll

11  -- I'll let counsel know.  All right?

12          MR. COOPERMAN:  Thank you very much, Your Honor.

13          THE COURT:  Let's talk about what I think is the

14  fourth category, and that is where in-house counsel may be

15  copied on documents.  It looks like there are about five or

16  six, seven documents that fall in that category.

17          MR. COOPERMAN:  Right.  You have the -- the

18  complaints about being cc'd, Your Honor?

19          THE COURT:  That's right.

20          MR. COOPERMAN:  Yeah.  And there are a number of

21  these documents, Your Honor.  Again, these are new argument,

22  new in the sense that we had hours of conversations with

23  McAirlaids' counsel on the phone and they did not raise

24  these arguments during those conversations and raised them

25  for the first time in the brief.  So this is our first

1     opportunity to respond to them.

2          But very, very simply, the documents that were

3     redacted, the redacted portions, show either requests for

4     legal advice or the transmission of legal advice.  And we're

5     not saying that -- and certainly we understand that merely

6     cc'ing an attorney on a document doesn't make it privileged.

7     But each of these documents substantively have either a

8     request for legal advice or are providing -- provision of

9     legal advice or a reflection, a conveyance, of legal advice

10    in the redacted portion.  And there are attorneys, at least

11    one attorney, who is identified as a cc; some of the

12    documents have multiple attorneys.  One of the documents,

13    Your Honor, doesn't have a specific attorney identified, but

14    it is a good example of where the underlying document is a

15    discussion among business folks.  And the business folks are

16    saying, essentially, without giving away too much detail,

17    "We have spoken with the legal department.  Legal had told

18    us X."  And that's an example where there was no specific

19    attorney name.  But we don't, again, believe that that makes

20    the document any less privileged because there is not a

21    specific attorney identified.

22          I think that's all I have got on the cc'ing, Your

23    Honor.

24          THE COURT:  All right.  And then Mr. Leonard.

25          MR. COOPERMAN:  Right.  So Mr. Leonard was an

1   employee of K-C at some point in time.  Again, he -- I think

2   from the documents that McAirlaids complains about -- oh,

3   and by the way, we produced close to a thousand documents

4   with Mr. Leonard's name on them that are not privileged.

5   For those that McAirlaids is complaining about, Mr. Leonard

6   was essentially an agent of Kimberly-Clark.  He was an

7   employee of this Phototype company.  And Phototype is a

8   company that designs advertising graphics for Kimberly-

9   Clark.  And these documents reflect either requests for or

10  provisions of legal advice as our agent, as K-C's agent

11  █████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  confidentiality agreements in place between Phototype and

15  K-C protecting these communications as business

16  confidential.

17          And, of course, as an agent who is protecting the

18  information confidentially and then providing or asking for

19  legal advice, the law, we believe, clearly protects those

20  sorts of communications.  And we can give you a couple cites

21  if you want, Your Honor.

22          THE COURT:  All right.  Well, I think I have those

23  as well.  But essentially the argument is that, as it

24  relates to Mr. Leonard, he was designing advertising -- and

25  I know this is going to be a gross generalization, but he's

1   designing the advertising for this particular product and

2   he's getting legal advice -- or at least he's in

3   communications with the K-C legal department as to whether

4   ███████████████████████████████████████████████████████

5   ██████████████████████████████████████████████

6   ██████████████████████████████████████████████████

7   █████████████████████████████████████████████████████

8   █████?

9           MR. COOPERMAN:  Yes, Your Honor.

10          THE COURT:  Is that basically what he's doing?

11  Okay.

12          MR. COOPERMAN:  Yes.

13          THE COURT:  All right.  I understand what he's

14  doing.  Okay.

15          Anything else, Mr. Cooperman, on the McAirlaids --

16          MR. COOPERMAN:  If you would give me one minute,

17  please?

18          THE COURT:  All right.

19      (Pause.)

20          MR. COOPERMAN:  I -- I would just add, Your Honor,

21  that on some of these, which, again, raise really issues

22  that we haven't had a chance to brief, either -- if Your

23  Honor has concerns, we would either ask for the opportunity

24  to brief and/or, to the extent counsel's representations,

25  you know, aren't sufficient, the opportunity to put in the

1    declaration from a business person, if necessary.  I don't

2    believe that they are.  But we're fully prepared to do so,

3    Your Honor.

4              THE COURT:  Okay.

5              MR. COOPERMAN:  That's all we have.

6              THE COURT:  All right.  Thank you.

7              All right.  Mr. Rottenborn, on the common interest

8    issue, any rebuttal?

9              MR. ROTTENBORN:  Yes.  Just briefly, Your Honor.

10             The bottom line is that it is K-C's burden.  This

11   is not an abstract exercise.  It is not an hypothetical

12   exercise on could there possibly be a common interest.  They

13   have the burden to show that there is a common interest.

14   And this whole briefing process, from the June 27th, when

15   our initial brief was filed, until today, it has been sort

16   of a follow-the-bouncing-ball-type exercise, where K-C has

17   tried to get Your Honor to recognize a common interest

18   without providing any evidence.

19             And first they say the common interest goes back to

20   July of 2012.  I think, if I heard Mr. Cooperman right, they

21   have essentially disclaimed the common interest privilege

22   from July 2012 and they have moved it up now to July 1st of

23   2013.

24             They didn't provide any evidence during the meet-

25   and-confer process; they didn't provide any evidence in

```
 1    their brief that B-B even knew of the lawsuit, let alone was

 2    engaged in a joint legal strategy.  On Friday, after the

 3    briefs had been filed, they send one email saying that B-B

 4    at least knew of the lawsuit after July 1st.  We don't

 5    believe that's sufficient to carry their burden.

 6              B-B is not a defendant here.  They are not going to

 7    be a defendant here.  We believe they can't be a defendant

 8    here.  And there's -- we don't believe that a single email

 9    conveying the fact of the lawsuit is what Mr. Cooperman

10    referred to as, quote, substantial evidence.  That's just

11    not enough.

12              So I think that -- that -- two things, Your Honor:

13    One, they must produce all pre-July 2nd, 2013.  And it is my

14    understanding -- and it is unfortunate that we're only

15    learning about this now, after we have briefed this, but

16    that K-C is not claiming attorney-client privilege, joint

17    defense privilege, any sort of privilege for items dated

18    prior to July 1st, 2013, if I understood Mr. Cooperman

19    correctly.  So I think there's no dispute that it doesn't

20    apply before that.

21              I think after July 1st, 2013, Your Honor at least

22    needs to review the documents that are claiming -- that K-C

23    is trying to withhold, to see if those establish a common

24    interest.  Because if they just talk about the logistics for

25    a plant inspection, that's not enough.  That doesn't
```

```
 1    establish any sort of joint legal strategy here.

 2              And, you know, for Mr. Cooperman to say that there

 3    are descriptions in the privilege log that should be enough

 4    I don't believe carries the day for the reason that, in the

 5    initial privilege log that was exchanged between the parties

 6    during the meet-and-confer process, the only information

 7    that was listed was that these documents related to an

 8    inspection of Beijing-Beuijut's manufacturing facility.

 9              We made it very clear in the meet-and-confer

10    process, as with all of the arguments raised in our brief

11    that we also raised in the meet-and-confer process, that we

12    were concerned that that did not carry their burden.

13              So then K-C went back and they put in what I

14    believe is just a completely ex-post made-for-litigation

15    description where they said, "Well, they're also discussing

16    this lawsuit and defending against the claims."  That was

17    made the eleventh hour, last Tuesday night, right before the

18    briefs were filed, in an effort to fend off the common

19    interest challenge.

20              So there may be a common interest; there may not

21    be.  But I think at a minimum Your Honor needs to review

22    those documents in camera.

23              THE COURT:  All right.  I'll -- I'm not sure I need

24    to do so yet.  I'm going to take a look at it.  If I need

25    them, I will let everybody know so I can get those promptly.
```

1          Anything else on the common interest,

2    Mr. Rottenborn?

3          MR. ROTTENBORN:  No, Your Honor.

4          THE COURT:  All right.  Ms. Waller, do you want to

5    follow up on your issues?

6          MS. WALLER:  Yes, Judge.  And I'll try and be

7    brief.

8          Where I would first start off with is that there

9    were a large number of issues.  As Mr. Cooperman said, it

10   was a large privilege log.  And McAirlaids met and conferred

11   in good faith and provided a list of every document that we

12   had an issue with in very short order, in order to meet

13   deadlines, in order to meet and confer twice on these

14   issues.  And we feel like we really teed this up in a proper

15   way.

16         That being said, there were so many issues.  And

17   what we're hearing about this "reflecting" issue kind of

18   goes to this quality of the privilege log issue that we have

19   encountered.  There was a paralegal who morphed into an

20   attorney, you know, 40 pages down.  She apparently went to

21   law school and then became a paralegal again.  It is just

22   one example.

23         You know, here we have "reflecting" that may be an

24   error, but that wasn't raised previously, that, you know,

25   "reflecting" could mean conveying or summarizing legal

1    advice, but we really don't know.

2         And the thing about privilege logs, as were said in

3    *Deel* and *ePlus* and *Adair* and all of these cases in Virginia,

4    in the Eastern and Western District, we only have the

5    descriptions to go by.  We don't have the beauty of looking

6    at the underlying documents and saying, "Oh, aha."  We have

7    to rely on the privilege log descriptions.  And in this

8    instance K-C provided us three of them during the course of

9    the meet-and-confer process.  So we have -- these issues

10   still exist on the third supplemental privilege log.  So we

11   would say that K-C has had the opportunity to rectify the

12   "reflecting" issue when it was going back and studying

13   things that we had identified, and those issues were not

14   raised.

15        And, again, if an item is merely reflecting legal

16   advice, especially when you have in-house counsel, that may

17   be kind of dancing close to business advice getting tangled

18   up in business advice, not just providing pure legal advice,

19   we would say that that -- you know, that that doesn't

20   qualify as attorney-client privilege.  And certainly, if it

21   is merely reflecting what an attorney said or, you know,

22   applying what an attorney said in a -- you know, in a report

23   or whatever, then that would not be attorney-client-

24   privileged communications.  And under the Fourth Circuit's

25   very narrow view of attorney-client communications, we would

1    view that those items would need to be produced.

2            Now, moving to the issue of copying a large number

3    of folks, this issue of need to know, Mr. Cooperman is

4    mistaken; it was briefed on page 11 of our brief.  We

5    discussed the *Deel* case and *ePlus*, this discussion of these

6    two tests via the need-to-know test under *Deel* and then

7    *Upjohn*.

8            And so we would say that it is fully -- that it is

9    ripe; that there -- you know, we are under a tight schedule

10   because there is a short discovery schedule in this case.

11   And we -- the parties briefed last Wednesday and were

12   prepared to come in and discuss these issues today.  So we

13   would suggest that -- you know, that this is a ripe issue.

14           And, again, in-house counsel doesn't -- you know,

15   or even outside counsel being copied on a communication

16   doesn't just insulate it from being produced.  And, again,

17   we only have the descriptions to rely on.  And that's what

18   the descriptions indicate, is that -- again, that these

19   folks were being just copied.  They are not the ultimate

20   addressee.  They are not the original addressee.  If you

21   look at the log entries themselves, they are in a slew of

22   other individuals, in some cases over 30 individuals, being

23   listed.

24           THE COURT:  All right.

25           MS. WALLER:  And, again, moving to the Leonard

1    issue briefly, you know, merely being an agent doesn't kind

2    of, I guess, insulate you or make you somehow subject to the

3    attorney-client privilege.  The Fourth Circuit, it is a very

4    narrow privilege in the Fourth Circuit.

5            And when we're discussing getting clearance on a

6    design with the legal department or being copied on

7    communications with the legal department, getting clearance

8    on a design and you are designing packaging, you know, I

9    don't think that that would qualify.  I think it is a very

10   tight line between whether that would qualify as legal

11   advice or whether that would be a business -- sort of a

12   business decision in our hypothetical here, because, you

13   know, K-C in-house counsel isn't in an attorney-client

14   relationship with Mr. Leonard.  And so we would suggest that

15   these documents do not rise to the level -- rise to the

16   level of attorney-client privilege.

17           And we have not seen these confidentiality

18   agreements.  I would suggest that a confidentiality

19   agreement with Mr. Leonard does not create the attorney-

20   client privilege.  And if it does have some sort of

21   provision where, you know, he's allowed to receive attorney-

22   client advice, we haven't seen these contracts produced.  So

23   we're working in the dark on that.  So we would ask that

24   those documents be produced in the course of discovery in

25   this case.

1            And finally, Judge, we -- we would say that if

2       there is any question, we believe that these documents

3       -- you know, if Your Honor has a question, we believe that

4       the proper way of dealing with this would be to look at the

5       documents in camera, and especially on the issue of the

6       "reflection" versus "conveying," on the issue of being

7       copied, and really on the issue of Mr. Leonard.

8            You know, if there are questions or close calls, we

9       think maybe reviewing the documents -- and not in the sense

10      I think Mr. Cooperman suggested:  a declaration that, I

11      guess, could potentially be submitted ex parte.  You know,

12      we think that the documents should be able to speak for

13      themselves on their face and be -- and indicate whether they

14      are attorney-client-privileged communications.

15           THE COURT:  All right.  Thank you very much.

16           Mr. Rottenborn, I forgot to follow up on one thing

17      that Mr. Cooperman raised.  And it is the second issue.  And

18      that is the document log entries 428, 2222, and 2224.  It

19      sounds as though 428 has already been produced.  And if it

20      -- if it hadn't -- or Mr. Cooperman is going to provide you

21      the Bates number for that, if it has already been produced.

22      So that would be moot.  But as to 2222 and 2224, if, in

23      fact, those were draft letters that never got out of

24      Kimberly-Clark and either stayed wholly within the legal

25      department or may have been shared with someone in the

```
 1   business department as it related to a draft of the letter
 2   to go to B-B, what is your position with respect to whether
 3   those would properly be withheld?
 4           MR. ROTTENBORN:  Yes, Your Honor.  With respect to
 5   428, we can -- I think Mr. Cooperman offered to provide us
 6   the Bates number of production.  And we don't need to do
 7   that here.
 8           THE COURT:  Right.
 9           MR. ROTTENBORN:  If he can just email us that
10   today, that would be great.
11           With respect to the other two, if they didn't leave
12   K-C, we don't want them; we think that they are properly
13   privileged.  It is just from the privilege log it appeared
14   that they had been potentially sent to Jay and Lou at B-B.
15   So we have no quarrel with those staying shielded, if they
16   did not --
17           THE COURT:  Okay.
18           And, Mr. Cooperman, on the privilege log, does that
19   have the Bates number that is on it?  It looks like the way
20   that -- in the McAirlaids' Exhibit A, there appears to be a
21   production number for 428.
22           MR. COOPERMAN:  I think that Bates number is a --
23   what she is saying is the document hasn't been produced.  I
24   may be wrong, but I believe that that's what that
25   particular --
```

```
 1              THE COURT:  Okay.  Well, you-all can work that
 2    issue out.
 3              UNIDENTIFIED VOICE:  We'll send the information,
 4    Your Honor.
 5              THE COURT:  All right.  Very well.
 6              All right.  From -- McAirlaids also has a clawback
 7    issue.  Who is going to argue that one?
 8              MR. ROTTENBORN:  Your Honor, this is Ben
 9    Rottenborn.  Can I just briefly respond on the couple -- I
10    don't think that I have got more than another few minutes.
11              THE COURT:  I'm sorry.  I couldn't hear you.
12              MR. ROTTENBORN:  Can I briefly respond to the
13    rebuttal from McAirlaids' counsel on the privilege issue?
14    There are just a couple things I would like to make clear on
15    the record, very briefly.
16              THE COURT:  All right.  Very briefly, because
17    -- all right.  Go ahead.
18              MR. ROTTENBORN:  Thank you.
19              We have not disclaimed the common interest
20    privilege before July 2013.  I want to make sure that is
21    clear.  We think it is at least as early as July 2013, as
22    shown by the documents.
23              The paralegal issue that was raised, it was just an
24    example of a typo.  That person -- employee of K-C has been
25    identified both as a lawyer and a paralegal.  And it is our
```

 1  mistake.  She is a paralegal.

 2          THE COURT:  Okay.

 3          MR. ROTTENBORN:  And on the need-to-know, again

 4  -- and apparently it was raised, and I apologize for that,

 5  but we have not had an opportunity to respond to that in

 6  briefing, if Your Honor goes there or is interested in that.

 7  We didn't understand that we had an opportunity for a

 8  responsive brief, even though McAirlaids filed one.

 9          And the bottom line, Your Honor, on that is that

10  the people on the email are involved in development or

11  marketing or sales of the product.  And they needed to know

12  what's going on in order to perform their business duties.

13          THE COURT:  All right.

14          MR. ROTTENBORN:  That's all I have.

15          THE COURT:  Okay.  Very well.

16          All right.  Let's talk about the clawback issue.

17  And I think it really just relates to this intellectual

18  assets strategy memo that I think I have already -- I have

19  already written on.  And it is my understanding that this

20  -- the memo was produced and -- and all that Kimberly-Clark

21  is seeking to claw back is this portion on page four,

22  paragraph seven.  Is that the only part that is at issue?

23          MR. ROTTENBORN:  That's correct, Your Honor.

24          THE COURT:  Okay.  All right.

25          MR. ROTTENBORN:  The memo was produced -- I think

1  it was produced five or six separate times in K-C's

2  production, all in unredacted form.  We're not arguing that

3  the number of times that it has been produced waives the

4  privilege, because I think under the protective order the

5  parties agree it doesn't.  But it did appear numerous times.

6       And we have no objection to clawing back the

7  majority of that paragraph.  We think it is properly

8  attorney-client privilege.  But we think the second-to-last

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15 ███████████████████████.

16      If anything, rather than providing legal services,

17 █████████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 █████████████████████████████████████████████████████████

20 could ask Mr. Rooyakkers, who is the author of this

21 █████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████.

24 We clearly would be able to ask him about that.  It is not

25 legal advice.  It is not privileged.  It is a business

```
 1   decision.
 2           And, you know, I think that -- that designating
 3   this as privileged is essentially an attempt by K-C to
 4   shield from the jury the fact that there wasn't this type of
 5   due diligence.  And I understand that Your Honor has ruled
 6   on this document before, last April, with respect to the
 7   trade dress case.  Obviously that was, you know, without us
 8   seeing what the portions were that were trying to be
 9   redacted.  And we certainly agree with Your Honor's ruling
10   that other portions of the document that -- were not
11   redactable.  But with respect to this last sentence, we
12   believe that it is very different from the rest of the
13   content of that paragraph.  And it is not privileged,
14   regardless of whether or not it came from legal counsel.
15   Information can come from counsel and not be legal advice
16   that falls under the attorney-client privilege.  And we
17   think that this clearly does not.
18           THE COURT:  Is K-C relying upon legal advice on any
19   of its -- any of its defenses with respect to the alleged
20   patent infringement?
21           MR. ROTTENBORN:  It is unclear, Your Honor.  Not
22   that we know of.
23           THE COURT:  Okay.  All right.
24           All right.  Mr. Cooperman?
25           MR. COOPERMAN:  Yes, Your Honor.  Briefly, on your
```

1    last question, I don't think we have decided yet whether

2    we're relying on legal advice on the patents.  I think the

3    parties have agreed on a date in the future where we will

4    let McAirlaids know about that.

5           Second, as Your Honor pointed out, you have already

6    looked at this, concluded that that section does reflect

7    advice from counsel and legal opinion and direction from

8    ████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████.

13   It is providing legal advice to the business on what to do

14   and what not to do.  I mean, it is the heart of the

15   attorney-client relationship between K-C's in-house counsel

16   and K-C's business and providing the guidance and the

17   counsel on how to move forward on projects.

18          So it very much reflects attorney-client-privilege,

19   sensitive information.  The fact that this advice and

20   counsel has been documented or understood as a -- you know,

21   as a policy or practice makes it, no less, still a

22   privileged communication and opinion and advice from

23   counsel.

24          THE COURT:  All right.  I understand -- I

25   understand the issue.

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  that is an important part of it, Your Honor.  It is guidance

7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

10          THE COURT:  Okay.

11          MR. COOPERMAN:  And that is at the heart, again, of

12  counsel providing guidance and advice to the business.

13          THE COURT:  All right.  Very well.

14          MR. ROTTENBORN:  Your Honor, if I may just briefly.

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

17  certainly we wouldn't use that sentence to suggest that K-C

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  conveys no legal information.  And, to the contrary, it

23  conveys information about when there will be no legal

24  information.

25          And so, you know, we certainly think that this is

1   not legal advice.  And we think that it would ultimately

2   certainly be fair game in a deposition to ask Mr. Rooyakkers

3   ████████████████████████████████████████████████████████

4   don't think it would be appropriate to instruct him not to

5   answer on the basis of privilege.

6            THE COURT:  All right.

7            All right.  Well, I'm going to -- I'm going to take

8   that under advisement.  And I'll get an opinion out on that

9   at the same time I get everything else out.

10           Mr. Rottenborn, has that covered all of the issues

11  that McAirlaids has?

12           MR. ROTTENBORN:  Yes, it has; I believe so, Your

13  Honor.  Thank you.

14           THE COURT:  Okay.  Very well.

15           All right, Mr. Cooperman, your turn.  I have got

16  your memorandum with respect to the documents that have been

17  withheld by McAirlaids.  So --

18           MR. COOPERMAN:  All right, Your Honor.  If you will

19  give me one moment to kind of switch gears here.

20           THE COURT:  All right.

21           It is the communications with Medline, I believe.

22           MR. COOPERMAN:  Yes, they are, Your Honor.

23           And -- so the issue here, Your Honor, is that there

24  really is no common legal interest.  We explain that in our

25  briefs.  The relationship between Medline and McAirlaids is

1    purely a business relationship based on the supply

2    agreement.  There is nothing going on here where Medline is

3    somehow being involved in either this lawsuit or these prior

4    discussions about the Artext lots, where Medline is not

5    trying to further any of its own legal interests.  It is

6    purely a business interest that it is trying to further.

7           Medline has no ownership rights in the patent.

8    They are not a licensee to the patent.  They are not accused

9    of infringing the patent.  This is a purely commercial

10   business interest.  And they are assisting McAirlaids,

11   apparently, to some extent; we don't know the full extent.

12   But their assistance doesn't establish a legal interest.

13   All it establishes is that they are hoping for a profit from

14   that business relationship.

15          Medline has no right, no legal rights, if any, on

16   the outcome of either this lawsuit or the prior lawsuit with

17   Artext.  Whether McAirlaids wins or loses this lawsuit,

18   Medline will still have a supply agreement with McAirlaids

19   to get the product.  This is purely a business relationship.

20   Of course, McAirlaids has legal rights that hinge on this

21   lawsuit.  It could potentially lose its patent, potentially

22   could be found that K-C isn't infringing the patent.  It

23   -- there's just a dichotomy between the business interests

24   on the one hand and the legal interests on the other.

25          McAirlaids likes to point to the K-C/B-B

 1   relationship as a flip side of the argument; and it isn't.

 2   It is completely different.  As we talked about already on

 3   this call, Your Honor, B-B has rights that hinge on the

 4   outcome of this lawsuit and is a potential named defendant

 5   and could be potentially found to have legal interests as a

 6   result of this lawsuit as a potential accused infringer, A;

 7   and, B, it has an indemnification obligation with K-C and a

 8   defense obligation with K-C under the business agreement

 9   that would impact its legal rights to have to potentially

10   indemnify K-C, depending on the outcome of this lawsuit.

11         So we have at least two legal interests that are in

12   common with K-C here, whereas B-B -- I'm sorry, Medline and

13   McAirlaids have no legal interests with regard to the

14   patents or this lawsuit or a prior lawsuit.  They are

15   aligned for profit.

16         That is essentially the essence of our argument,

17   that there cannot be a common legal interest because

18   -- between Medline and McAirlaids because it is purely a

19   business commercial relationship, no common legal interest.

20         THE COURT:  Okay.  I understand.

21         All right.  Mr. Rottenborn?

22         MR. ROTTENBORN:  Yes, Your Honor.

23         We obviously disagree with Mr. Cooperman.  I think

24   that this is directly analogous to the B-B/K-C relationship.

25         We have an exclusive -- McAirlaids has an exclusive

1   supply agreement with Medline.  That means that in terms of

2   the hygienic bed mat arena, Medline is the only customer

3   that McAirlaids can sell to.  They both have an interest in

4   protecting against the infringement of the '702 patent.  The

5   '702 patent number is on Medline's product that it sells.

6   They both have an interest in preserving the enforceability

7   and the validity of the patent.

8          Those three things -- infringement, enforceability,

9   and validity -- that's exactly the subject of the common

10  interest agreement between Beijing and K-C.

11         And, in fact, in these cases, in the Artext

12  litigation, and I believe there were two other competitors

13  as well, so all three of the either litigation or potential

14  litigation that are listed on the log, Medline alerted

15  McAirlaids and asked McAirlaids to take some action to

16  protect both companies by enforcing the '702 patent.

17         K-C cites cases in its brief that I think are

18  inapposite.  The chief one, the only one that I'll discuss

19  here, is the *Arimony* case.  And that was a case where the

20  defendant was an individual who defrauded a nonprofit

21  organization and had exchanged emails with -- he was

22  criminally charged.  The organization wasn't criminally

23  charged.  And he had exchanged some emails with that

24  nonprofit's attorneys.  And the court said that the

25  preservation of the nonprofit's reputation is not a legal

1     matter.

2          This is much more involved in this.  It involves,

3     again, the enforcement of a patent that is marked on

4     Medline's product that it sells, and is intricately

5     involved, both from McAirlaids' end and in the business that

6     Medline conducts.  And we believe that that is more than

7     enough to show that there's a legal interest.

8          Now, K-C says, well, B-B has an indemnification

9     agreement with K-C.  But they have cited no law, and there's

10    none that I can find, that says that that's the linchpin of

11    a common interest privilege; that there's some -- that the

12    indemnification that doesn't involve McAirlaids, that

13    McAirlaids isn't really concerned with, frankly, at this

14    point, that that somehow is enough to put something in the

15    realm of common interest, but the exclusive supply

16    relationship that Medline and McAirlaids share isn't enough.

17         So I think that for those reasons we obviously

18    agree -- or disagree with K-C.  We believe that these

19    documents are covered by the common interest privilege.  And

20    if they are not, certainly to the extent that -- just

21    hearkening back to the argument on Dean Leonard, while we

22    don't believe that an agency relationship in and of itself

23    shields the documents, if Your Honor doesn't compel K-C to

24    produce documents related to Dean Leonard, that argument

25    would apply even more forcefully to the Medline documents

```
 1   here, where there's -- there is an exclusive supply
 2   agreement.  There is a confidentiality provision, I believe,
 3   in that agreement.  And so the documents should be shielded
 4   on that alternative basis.  But, again, we don't -- we don't
 5   believe that that is necessarily a basis to withhold
 6   documents.
 7              THE COURT:  Okay.  All right.
 8              Mr. Cooperman, anything --
 9              MR. ROTTENBORN:  And the last --
10              THE COURT:  Go ahead.  Sorry.
11              MR. ROTTENBORN:  -- the last point, Your Honor, is
12   -- the last point simply is one that the common interest
13   doctrine and the joint defense privilege -- you hear the
14   name "joint defense."  There's nothing special about being a
15   defendant.  The common interest privilege or the common
16   interest doctrine applies equally to plaintiffs and
17   defendants.  We have cited case law for that in our brief.
18   And that makes sense, because otherwise, you know, you could
19   have -- someone on the plaintiff's side could never have a
20   common interest agreement with a third party.
21              THE COURT:  Okay.
22              All right.  Mr. Cooperman, any follow-up?
23              MR. COOPERMAN:  Yes.  Real briefly, Your Honor.
24              We're not saying that there can't be a common
25   interest between parties who are aligned on the plaintiff's
```

```
 1   side.  That wasn't our argument at all.

 2            We're saying that McAirlaids has simply not

 3   identified a common legal interest here, as opposed to a

 4   business interest.  But the supply agreement between

 5   McAirlaids and Medline makes no difference.  Medline wants

 6   McAirlaids to go after its infringers and give them

 7   information and (inaudible) its profits in the marketplace.

 8   And even if McAirlaids were to move this lawsuit and have

 9   this patent invalidated as a result of this lawsuit, it

10   would have no legal impact on Medline.  In fact, Medline

11   would still have a supply agreement -- a valid supply

12   agreement with McAirlaids and will still get products from

13   McAirlaids and will still sell those products to its

14   customers, because Medline has no legal interest in the

15   patents that are in this lawsuit.

16            THE COURT:  All right.  Well, I will look --

17            MR. ROTTENBORN:  If I may -- just ten seconds, Your

18   Honor.

19            I'm just saying that if K-C loses this lawsuit,

20   there is no clear legal implication for B-B.  They keep

21   talking about the indemnification clause.  It is not even

22   clear that that would apply.  That is not our fight.  It is

23   not your fight at this point.  And so I think that the

24   parties are positioned -- Medline and B-B are positioned

25   equivalently with respect to the issue.
```

1          THE COURT:  All right.  Well, I will look -- I will

2     look carefully at the supply agreement for Medline.  And I

3     will get an opinion out on that.

4          Here is what I would like to do, is -- I know there

5     is some question about whether further briefing may be

6     necessary.  It is going to take me a little bit of time to

7     get something out.  And my plan was to have an opinion out

8     within ten or eleven days.

9          If anyone wants to file any supplemental briefs on

10    issues that were not anticipated -- I think when I set up

11    the briefing schedule, I was anticipating this being

12    primarily a common-interest/joint-defense-type argument that

13    had been mostly briefed.  And I -- you know, while certainly

14    I knew there may be some other issues that were out there, I

15    didn't fully allow for any follow-up or rebuttal.  So any

16    -- any responses that anyone wants to provide, provide them

17    by the end of the day -- and when I say "end of the day,"

18    you know, sometime before the clock turns 12 on Thursday.

19    So you'll have through the end of the day on this Thursday

20    to provide any follow-up that you want.

21         It doesn't need to be long.  It doesn't need to be

22    extensive.  You-all have well briefed the legal issues.  And

23    I don't need you to revisit those.  But to the extent that

24    there are fact issues that either side feels that they need

25    to further flesh out based upon the responses -- or the

```
 1    briefs that are already out there or the argument today, get

 2    that to me by Thursday.  And I'll get an opinion early next

 3    week out to you-all.

 4              All right?

 5              MR. COOPERMAN:  Great.  Thank you, Your Honor.

 6              THE COURT:  Anything else that we need to address?

 7              MR. COOPERMAN:  Your Honor, from K-C's perspective,

 8    there is another clawback issue that we put in our letter to

 9    you of last Friday.  And if I may very briefly, this

10    involves a draft email to the court that was prepared for

11    the trademark case that was inadvertently provided in this

12    case, the patent case.  And that would be in connection with

13    an in camera provision of documents on privilege issues.

14    And we're asking -- we have asked for that document to be

15    clawed back.  Counsel has agreed in principle to the

16    clawback of that document, but they had wanted to preserve

17    the right to use it to somehow argue that our ex parte

18    -- counsel's ex parte communications are somehow improper.

19    Of course, we don't feel at all, A, that those

20    communications were improper in any way.  They were

21    responsive to the court's order asking for the ex parte

22    submission.  And then, in any event -- I think we can leave

23    it as it was proper, Your Honor.  I don't know that we have

24    anything else to add on that, other than it should be

25    provided back to us.  There's nothing in the protective
```

1  order that says otherwise.

2          THE COURT:  All right.

3          Mr. Rottenborn?

4          MR. ROTTENBORN:  Your Honor, if I may.

5          THE COURT:  All right.  Yes.  Please.

6          MR. ROTTENBORN:  Sorry.  This is Ben Rottenborn.

7          The -- you know, it is interesting that in

8  Mr. Cooperman's email or letter to you on Friday he didn't

9  include that email's attachment.  I would be happy to send

10  it to the Court.

11          Your order -- Mr. Cooperman's letter says that all

12  this email did was do what your order requested.  Your order

13  back in April asked K-C to submit an unredacted version of

14  the document at issue for the court to review as well as

15  information regarding the author of the document and to whom

16  the document was disseminated, author of the document and to

17  whom the document was disseminated.  That is in docket

18  number 48 in the trade dress case.  That was it.

19          The email that we saw, which was troubling to us --

20  and, again, to Mr. Cooperman's point, we have no problem

21  allowing him to claw it back, but we do have this concern.

22  It wasn't something we were going to raise with the Court,

23  but now that Mr. Cooperman has opened the door, we are

24  troubled by it.

25          By its -- a check of the document, it says that it

1    is designed to, quote, provide context as to why the

2    redacted text is privileged, and then proceeds to give a lot

3    more information than just the authors and recipients.  And

4    we think that is inappropriate.  It is certainly not

5    something that was the type of contact that we would have

6    with the Court.

7            And I'm not suggesting that it is something that

8    the Banner firm would do.  I know that it was a different

9    firm that was handling this in the trade dress case.  And

10   while we have no general objection to the claw back, I would

11   ask that, in light of this, that the Court -- and, again,

12   I'm happy to send the documents to the Court, but the Court

13   admonish K-C -- and, of course, McAirlaids agrees to abide

14   by this as well -- not to improperly provide more

15   information than the Court requests when fulfilling an ex

16   parte request, because that -- you know, that causes issues

17   with respect to, you know, the adversarial process.

18           And there are a number of things in that document

19   that it relies upon that are simply incorrect.  For example,

20   it refers to a John Rooyakkers' declaration regarding the

21   number of people that the document was disseminated to.  And

22   I think it lists five people.  We have documents from K-C's

23   production showing that that same document was sent to 27

24   people.  And that's the sort of thing where, if those type

25   of communications are made to both parties in an adversarial

```
 1   manner, the parties can dispute those facts.  But when they
 2   are made to the Court and one party doesn't get to see it
 3   and they go way beyond what the Court asks, then, again,
 4   that quells the adversarial process and it keeps McAirlaids,
 5   in this case, from correcting some of the inaccuracies that
 6   were referred to.
 7           So, again, not something we wanted to raise, but
 8   since Mr. Cooperman decided to raise it, we're happy to
 9   allow him to claw that back, but it is a concern that we
10   have and we were troubled by it.
11           THE COURT:  All right.  Well, I'm not sure there's
12   anything, really, the Court needs to do.  I have -- I have
13   ruled on the -- that particular document.  I don't have the
14   email in front of me, obviously, but I'm pretty sure I
15   recall it.  It relates to the Sealy document, if memory
16   serves me correctly.  I think that my opinion relied
17   -- relied upon its review of the document and the
18   declarations and briefs that were of record, and not of any
19   representations that were made within the letter or the
20   email.  And so I don't think there's anything else that the
21   Court needs to do in that regard.  I -- and if there's an
22   agreement to claw it back, I'll do so.
23           I think that, obviously, to the extent that there's
24   a concern regarding ex parte communications, your point is
25   made, Mr. Rottenborn.  And I think Mr. Cooperman has
```

```
1    listened to you.  So I -- but I'm not sure that there's

2    anything else that I need to do.  And I'm not sure that

3    further briefing on it or having me write on it really

4    advances the ball with respect to the issues that are

5    driving the patent case.  So I think that covers --

6            MR. ROTTENBORN:  Yes, Your Honor, agreed.  We just

7    want to make clear that it was something that should be

8    clawed back, all copies should be clawed back under the

9    agreement, and there wasn't any ability for counsel for

10   McAirlaids to hold on to this for some other potential

11   argument down the road.

12           THE COURT:  And that's what I think that they have

13   agreed to do.

14           So --

15           MR. COOPERMAN:  That's correct, Your Honor.

16           THE COURT:  All right.  Anything else that we need

17   to do?

18           MR. LONG:  Your Honor, Josh Long here.  We just had

19   one more issue that's currently ripe, in the sense of the

20   meet-and-confer process.  It has not been briefed yet.  And

21   it relates to some workbooks of Angela Johnston in

22   connection with this patent case.  Your Honor has decided

23   some issues on that in connection with the trade dress case.

24   But circumstances have changed and we have additional

25   information that we think is very important on that topic.
```

1          What I would like to do, Your Honor, is we have

2    Angela Johnston's deposition scheduled in Wisconsin on

3    October 9th.

4          THE COURT:  Okay.

5          MR. LONG:  And we need to be able to get some

6    clarity prior to that deposition as to whether we're

7    entitled to a complete, unredacted copy of her notebooks.

8    And the concern would be if we didn't get that issue

9    resolved before October 9th, then we certainly would

10   necessarily have to depose her twice, to come back in on any

11   additional redactions that were left in connection with

12   those notebooks.

13         So what I would ask is -- if we could, is perhaps

14   just to go ahead and set a date.  And I'm amenable to

15   whatever briefing schedule that you and K-C want.  But we

16   would like to try to get that teed up so we can have some

17   clarity in advance of that deposition as to whether we're

18   going to have access to any of the other portions of her

19   workbooks that have been redacted.

20         THE COURT:  Well, I'm happy to set a date.  We can

21   do it -- it seems to me that we --

22         MR. COOPERMAN:  Your Honor, could you speak up a

23   little?  I'm sorry.

24         THE COURT:  I say it seems to me we can resolve

25   this either -- or, first of all, Mr. Cooperman, how much

```
 1   time do you need to be able to respond to the pending
 2   motion?
 3           MR. COOPERMAN:  Well, I would like the full 14
 4   days, I think, Your Honor.  We have got a lot of issues
 5   going on, a lot of depositions coming on.  And we're
 6   approaching the close of discovery.
 7           THE COURT:  When was the motion filed?
 8           MR. LONG:  It has not been filed, Your Honor.  We
 9   could certainly file it within the next few days.  We just
10   wanted to see if we could -- the concern being the
11   deposition is set, and we don't want to have to do the same
12   thing twice unnecessarily in the event that your ruling gave
13   us access to more information that is being withheld.
14           THE COURT:  Well, I mean, here I am -- I'm looking
15   at -- you know, today is the 15th.  If you file your motion
16   -- well, I'll tell you what --
17           MR. LONG:  I'm sorry, Your Honor.  I couldn't quite
18   hear you.
19           THE COURT:  Well, I'm thinking out loud.  Well,
20   here is what I'm -- here is what I'm going to do is -- I am
21   generally very available.  You-all file the motion.  Have
22   you all -- and confer on it, if you haven't already done so.
23           MR. COOPERMAN:  Yes, Your Honor, we have conferred
24   and aren't able to agree on it.
25           THE COURT:  All right.  And -- if -- and -- and
```

1   then schedule a hearing before October the 3rd, because that

2   -- if you have a hearing by the 3rd, even if I -- even if I

3   rule there, getting everything out -- it gets it out by the

4   6th or 7th to you-all, which then leaves you just a day or

5   two to be able to review it.

6           So it is incumbent upon you-all to file the motion

7   promptly.  And -- and any briefing to be done -- since the

8   -- under CM/ECF you get these things immediately,

9   Mr. Cooperman, I'm going to take away your three days that

10  the rules give you for mailing, which I never have

11  understood anyway with electronic filing, since you get them

12  right away.

13          But file a motion today or tomorrow at the latest,

14  Mr. Long, and get a hearing for October 1st or 2nd.  I do

15  have a mediation down in Danville that I could take some

16  time and have a telephone conference on, but I would prefer

17  to do it at some point either on the 1st or 2nd.

18          MR. LONG:  Thank you, Your Honor.  We'll do that.

19  We'll be sure to file before the end of the day tomorrow.

20  We appreciate that.  And we'll coordinate with counsel to

21  set a hearing on the 1st or the 2nd.

22          THE COURT:  All right.  Anything else we need to

23  cover?

24          MR. COOPERMAN:  One brief issue, Your Honor, from

25  K-C's perspective.  And this is a document-production issue.

1          We have a situation where on the last day of the

2     exchange of documents McAirlaids essentially dumped on us

3     20,000 pages of documents from their U.S. and, for the first

4     time, their German affiliates.  And when we looked at those

5     documents -- and these are produced in electronic form, Your

6     Honor -- the attachments to the documents are -- it is not

7     clear what attachments go with what documents.  The

8     documents, essentially, are disorganized.  They weren't

9     produced as they are kept in the ordinary course of

10    business.

11         We have written McAirlaids about this.  They have

12    put us off.  They haven't told us when they are going to

13    give us the corrected documents or if they are even going to

14    give us corrected documents.  And we -- we actually have a

15    deposition coming up, Your Honor, in two weeks, where these

16    documents need to be reviewed before that.  And we're

17    looking just for some direction to have McAirlaids provide

18    us, as promptly as possible, with maybe a date certain, the

19    documents in the form as they are kept in the ordinary

20    course of business.  That's all we're asking.

21              THE COURT:  All right.

22              MS. WALLER:  Judge, if I may -- this is Beth

23    Waller.  If I may briefly respond?

24              THE COURT:  Yes.

25              MS. WALLER:  Mr. Cooperman's assertion that we did

```
 1    not tell him when we would get back or when -- you know, if
 2    we would get back is incorrect.  I told him that we had
 3    forwarded this information on to our vendor.  I'm currently
 4    coordinating with the vendor.  And I told him that we would
 5    get the information as soon as possible.  And I hope to be
 6    able to get him this information today.
 7          But that's an incorrect statement that we were, you
 8    know, not going to provide these .dat files.  They received
 9    the 20,000 pages.  What Mr. Cooperman is complaining about
10    is there was a little issue with the underlying metta data
11    as to where the attachment cut off.  And so we're having
12    those issues reproduced.  We ended up having to work with
13    two different vendors in order to get documents from both
14    the U.S. company and the German company.  And so we're
15    trying to get those .dat files to them just as soon as
16    possible.  And I hope to have them today, but I can't
17    promise them today.
18          THE COURT:  All right.  Well, I think -- and I
19    think I have had to deal with this in other cases.  I agree,
20    the documents do have to be produced at least in the way in
21    which they are kept in the ordinary course, electronically
22    or even in paper form, if they were paper documents to begin
23    with.  And so it sounds like that is being done.
24          If that is an issue that needs to be addressed, at
25    the same time we'll take it up, as it relates to the
```

```
 1    deposition of -- or the notebook of Ms. Johnson.  But it
 2    sounds like that is not going to be an issue that has to be
 3    addressed.  I appreciate you-all continuing to work
 4    diligently with one another to make sure that the documents
 5    do come out in a form that they can be used, can be
 6    reviewed, and allow you-all to be able to focus on the
 7    issues at hand in the case, and that is -- and be able to
 8    use them in such a way that you can take depositions and get
 9    the questions to the fact issues that you have -- or the
10    answers to the fact issues that you have.
11              So -- all right?  At the risk of --
12              MR. COOPERMAN:  Thank you, Your Honor.
13              THE COURT:  All right.  At the risk of asking one
14    more time, have I covered everything now?
15              MR. COOPERMAN:  The only other thing, Your Honor,
16    is that I think we're going to need to have portions of this
17    transcript sealed.  There have been not only confidential
18    discussions about sensitive documents, but there has also
19    been quotes from McAirlaids' counsel of K-C's privileged
20    documents.  And if Your Honor were to find that those
21    documents were properly privileged, we're going to need to
22    address how to modify the record so that those privileged
23    communications are no longer in the record.
24              THE COURT:  Well, I think that there is a -- since
25    this is on FTR, and not a court reporter's notes, there
```

```
 1   would have to be a request for the transcript first.  And

 2   then there's a period of time at which counsel will have the

 3   ability to be able to make those portions -- the sealed

 4   portion -- a request for the sealed portions.  And exactly

 5   what that procedure is, I'm not positive.  But the clerk's

 6   office can advise you-all what that timing is.

 7         But there is -- no one can get this, in other

 8   words, Mr. Cooperman, without you first knowing that there

 9   has been a request for the transcript to begin with.  And

10   then you'll be --

11         MR. COOPERMAN:  Thank you, Your Honor.

12         THE COURT:  -- you'll have plenty of time to act

13   after that.

14         MR. COOPERMAN:  Thank you.

15         THE COURT:  All right?

16         MR. COOPERMAN:  Nothing else.

17         THE COURT:  All right.  Very well.  I wasn't going

18   to take anything else.  So -- all right.

19         MR. LONG:  Thank you, Your Honor.

20         MR. ROTTENBORN:  Thanks very much, Judge.

21         MS. WALLER:  Thank you.

22         THE COURT:  I'll look to hear from you-all by the

23   end of the week.  And then I'll get something out for you on

24   these issues.

25         Thank you very much, counsel.  And, again, I
```

1    apologize for our technical problems here at the front end.

2    I appreciate your patience.

3            All right.  Very well.  Stand in recess.

4        (Thereupon, these proceedings were adjourned at

5    11:30 a.m.)

6

7        I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10       _____/s/ Carol Jacobs_____            October 7, 2014
     Official Court Reporter              Date

11       I certify that the foregoing is a true and correct copy
     of the transcript originally filed with the clerk of court
12   on 10/7/2014, and incorporating redactions requested by the
     following attorneys of record:  Kevin P. Oddo, in accordance
13   with Judicial Conference policy.  Redacted characters appear
     as a black box in the transcript.

14       _____/s/ Carol Jacobs_____            January 6, 2015
     Official Court Reporter              Date
15

16

17

18

19

20

21

22

23

24

25